**STATE of Rhode Island**

v.

**RHODE ISLAND BROTHERHOOD OF CORRECTIONAL OFFICERS.**

**No. 2001–590–Appeal.**

Supreme Court of Rhode Island.

April 15, 2003.

Anthony A. Cipriano, Cranston, and Paul S. Mancini, Warwick, for Plaintiff.

Gerard P. Cobleigh, Warwick, for Defendant.

Present: WILLIAMS, C.J., FLANDERS and GOLDBERG, JJ.

## OPINION

PER CURIAM.

This case came before the Supreme Court on March 4, 2003, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After hearing the arguments of counsel and reviewing the memoranda of the parties, we are satisfied that cause has not been shown. Accordingly, we shall decide the appeal at this time.

On December 6, 1996, Thomas Ryan (Ryan), a correctional officer with the Department of Corrections (DOC), was assigned to the Eleanor Slater Hospital, a state facility for prison inmates undergoing medical treatment. Ryan was responsible for guarding inmate Jerry Steele (Steele) and, at 11 p.m., upon the conclusion of his shift, he relinquished his keys to correctional officer Noel Taylor (Taylor). At approximately 11:45 p.m., Taylor noticed that a handcuff key was missing from the key ring; he then notified his superiors at the Medium Security facility. Ryan joined Taylor in searching for the missing key, but it was not found at that time. A report on the missing key was filed and an intensive search of Steele's room was conducted on December 9, 1996. During the search, Steele admitted that he had the handcuff key secreted inside a cup of hot chocolate. When chief inspector Aaron Aldrich (Aldrich) questioned Steele about the circumstances in which he acquired the handcuff key, the inmate stated that Ryan was "weak" and that he had been "working on him." [1]

The subsequent inspector's report concluded that Ryan was responsible for misplacing the handcuff key during his shift and recommended that discipline be imposed for dereliction of duty. As a result, a disciplinary hearing was scheduled. At the close of the investigation, Ryan was terminated from his position for conduct unbecoming a correctional officer. Ryan filed a grievance, pursued by his union, the defendant, Rhode Island Brotherhood of Correctional Officers (union or defendant), and the matter was submitted to arbitration.

At the subsequent arbitration proceeding, Steele testified, according to the arbitrator, that Ryan shared personal information with him and discussed his domestic and financial problems at length. Steel also claimed that Ryan shared pizza, sandwiches, candy, and soda with him. Ryan admitted that he shared food and candy with Steele and engaged in personal conversations with him about car repairs and child support arrearages. Steele further testified that he offered to provide Ryan with $160 in exchange for a handcuff key. The State Director of Corrections, George A. Vose, Jr. (Vose) testified and insisted that Steele's narrative of the events of December 6 was the only plausible explanation for Steele's acquisition of the handcuff key. Vose testified that the code of ethics for correctional officers prohibits personal relationships with inmates because the consequences of such illicit relationships could undermine the authority and command of the correctional officer. Vose also testified that Ryan's discharge was justified in view of the risk of escape and the possibility of injury to others.

The state argued that Ryan was a coconspirator and a participant in inmate Steele's scheme to escape. The state also alleged that Ryan failed in his duty to report the action and was in clear violation of the code of ethics. The state noted that

---

1. Specifically, Steele told Aldrich that Ryan mentioned that he needed $500 for car repairs and $1,400 for child support.

Ryan acknowledged his familiarity with the code and knew of his obligation to report illegal behavior on the part of the inmates. The state alleged that Ryan made a conscious choice to be dishonest about his inappropriate relationship with Steele, and therefore, his discharge was warranted.

After assessing the credibility of the various witnesses, the arbitrator opined that "the facts [did] not support the [s]tate's allegation[s]" and that "credibility [was] a dominant factor in determining the outcome" of the case. The arbitrator found that the state failed to prove that Steele paid Ryan for the handcuff key; nor was it able to demonstrate how Steele was able to acquire the funds necessary for the purchase. The arbitrator theorized that Ryan accidentally may have dropped the handcuff key, noting Steele's testimony that Ryan would not be able to see a misplaced key without his eyeglasses. Although the arbitrator found that there was sufficient proof that Ryan developed an inappropriate personal relationship with Steele, the arbitrator rationalized Ryan's behavior on the ground that a hospital setting was more likely to foster an unsuitable relationship than a prison environment. Thus, the arbitrator found that Ryan's transgression in developing a friendship with Steele did not furnish the requisite just cause for termination, and he proceeded to modify the penalty to a sixty-day suspension. The state filed a motion to vacate the arbitration award and the defendant filed a petition to confirm the award.

Citing two previous decisions by this Court, *Rhode Island Laborers' District Council v. State*, 592 A.2d 144 (R.I.1991) and *State Department of Corrections v. Rhode Island Brotherhood of Correctional Officers*, 725 A.2d 296 (R.I.1999) (per curiam) (*State DOC*), the trial justice held that it would be "irrational" to conclude that a DOC director, pursuant to G.L.1956 §§ 42–56–10(2) and 42–56–10(7), lacked the power to fire a correctional officer such as Ryan who allowed himself "to be compromised by an inmate, thereby creating a potential security risk." The trial justice further concluded that "the arbitrator herein may not substitute his judgment for the [d]irector regarding the appropriate disciplinary measure[s]." As a result, the trial justice granted the state's petition and vacated the arbitration award.

On appeal, the union asserts that the decision to terminate Ryan was based primarily on the allegation that Ryan conspired to help Steele escape. The defendant points out that the arbitrator specifically found that this allegation was not proven. Thus, according to defendant, the arbitrator's imposition of a lesser penalty was justified. The defendant also argues that the trial justice erred in determining that the arbitrator did not have the authority to modify the director's penalty.

The state counters that the Director of the Department of Corrections has been vested with broad disciplinary powers pursuant to § 42–56–10,[2] including the authority to determine an appropriate disciplin-

---

**2.** General Laws 1956 § 42–56–10 empowers the director of corrections to, *inter alia:*

"(2) Maintain security, safety, and order at all state correctional facilities * * *;

"(3) Establish and enforce standards for all state correctional facilities;

" * * *

"(5) Manage, direct, and supervise the operations of the department;

"(6) Direct employees in the performance of their official duties;

"(7) Hire, promote, transfer, assign, and retain employees and suspend, demote, discharge, or take other necessary disciplinary action;

" * * *

ary sanction for a correctional officer who is guilty of deliberate misconduct. In addition, the state argues that the termination was justified because Ryan's personal relationship with Steele constituted a serious threat to security within the correctional facility.

The state points to *State DOC, supra,* as authority for the decision of the trial justice. In that case, we vacated an arbitration award purporting to reinstate a correctional officer who had been convicted and incarcerated for driving under the influence of alcohol in the Commonwealth of Massachusetts.[3] In so doing, this Court acknowledged that G.L.1956 § 28–9–1 empowers an arbitrator to modify employer-imposed penalties; however, we harmonized that provision with the director's authority under § 42–56–10, concluding that it was not the Legislature's intention to cede disciplinary authority to an arbitrator. Given his "awesome responsibility" in the area of public safety, we held that the director of a correctional facility must have the ultimate power to fashion the appropriate disciplinary sanction. Specifically, this Court stated that "[t]he Legislature could not have intended to make the paramount disciplinary function of the director subject to the caprice of an arbitrator." *State DOC,* 725 A.2d at 299. Rather, the director of corrections had the "nondelegable authority to maintain security, safety, and order at all state correctional facilities[,]" and his or her disciplinary powers pursuant to § 42–56–10 could not be bar-

gained away within a collective bargaining agreement. *State DOC,* 725 A.2d at 298. *See Rhode Island Laborers' District Council,* 592 A.2d at 146 (holding that the arbitrator's award reducing to suspension the chief judge's discharge of a deputy court clerk was irrational); *see also Vose v. Rhode Island Brotherhood of Correctional Officers,* 587 A.2d 913, 915–16 (R.I.1991) (the DOC policy requiring correctional officer to work mandatory involuntary overtime was valid and the issue was not arbitrable).

After careful review of the record in this case, we conclude that the arbitrator did not have the authority to alter the discipline imposed by the director. We are mindful that the core function of the DOC is to ensure that prison inmates do not escape and threaten the safety of the community. Consequently, correctional officers must be held to a higher standard of behavior, and the responsibility of a correctional officer cannot be compromised by an illicit relationship with a prison inmate. To excuse this conduct with a mere sixty-day suspension is an irrational result.

For the reasons set forth herein, the defendant's appeal is denied and dismissed and the judgment is affirmed. The papers in this case may be remanded to the Superior Court.

"(9) Determine the methods, means, and personnel by which those operations of the department are to be conducted;

"(10) Relieve employees from duties because of lack of work or for other legitimate reasons;

"* * * *

"(22) Make and promulgate necessary rules and regulations incident to the exercise of his or her powers and the performance of his or her duties, including, but not limited to, rules and regulations regard-

ing * * * safety, discipline, * * * training, [and] employment * * *."

**3.** The appellee in *State Department of Corrections v. Rhode Island Brotherhood of Correctional Officers,* 725 A.2d 296 (R.I.1999) (per curiam) did not provide the Court with legislative history, case law or principles of statutory construction to support such a conclusion, nor did this Court indicate the legal foundation underpinning its analysis of the statutes.