**STATE of Rhode Island, DEPARTMENT OF CORRECTIONS**

v.

**RHODE ISLAND BROTHERHOOD OF CORRECTIONAL OFFICERS.**

No. 2003–42–Appeal.

Supreme Court of Rhode Island.

Feb. 25, 2005.

Michael B. Grant, Pawtucket, for plaintiff.

Andrew H. Berg, Providence, for defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## O P I N I O N

SUTTELL, Justice.

This case comes before us on cross-appeals filed by the plaintiff, State of Rhode Island, Department of Corrections (state or DOC), and the defendant, Rhode Island Brotherhood of Correctional Officers (RIBCO), from a Superior Court order confirming in part and vacating in part an arbitrator's award.

Contending that the arbitrator overlooked material evidence and that his findings were irrational, the state appeals from the denial of its motion to vacate the arbitrator's award of back pay and benefits to a former correctional officer. On its part, RIBCO appeals from that portion of the Superior Court order that vacated the arbitrator's award of prejudgment interest. For the reasons hereinafter set forth, we reverse the order of the Superior Court and direct that judgment be entered consistent herewith.

### Facts and Procedure

On February 26, 1993, four detectives and officers of the Johnston Police Department, accompanied by two DOC investigators, executed a search warrant at the apartment of Anthony Algasso. At the time, Mr. Algasso had been employed as a correctional officer/steward at the Adult Correctional Institutions (ACI) for nearly twenty years. Among the items seized by the police were a partially smoked marijuana cigarette; a white powdery sub-

stance suspected of being cocaine; various drug paraphernalia; food and kitchen items allegedly stolen from the DOC; fourteen towels, blankets and other linens clearly marked as property of the Department of Mental Health, Retardation and Hospitals (MHRH); and five cable television converter boxes.

Upon receipt of a report from one of the DOC investigators, the then-director of the DOC, George A. Vose, Jr., convened an administrative hearing to review the charges against Mr. Algasso. The specific charges were that he had participated in the theft of DOC food items and kitchen supplies, as well as MHRH linens and/or towels, and that he had committed two counts of off-duty misconduct for the possession of illegal drugs and possession of an illegal cable television hookup. A fourth charge alleging off-duty misconduct for the possession of stolen state property subsequently was added.

By letter dated April 14, 1993, Director Vose notified Mr. Algasso that his employment as a correctional officer/steward at the DOC was to terminate, effective April 25, 1993. The termination letter indicated that the four charges were factually substantiated and that "any one of the charges regarding theft, possession of stolen items, or possession of marijuana and cocaine, standing alone, warrant discharge." RIBCO immediately filed a grievance, pursuant to the Rhode Island Brotherhood of Correctional Officers' Collective Bargaining Agreement (CBA), on behalf of union member Mr. Algasso, alleging that his dismissal violated the CBA because it was without just cause.

The CBA in effect at the time contained several provisions relevant to the issue of employee termination and discipline, including:

Article 4.1: "The Brotherhood recognizes that except as limited, abridged, or relinquished by the terms and provisions of this Agreement, the right to manage, direct, or supervise the operations of the State and the employees is vested solely in the State.

"For example, the employer shall have the exclusive right, subject to the provisions of this Agreement and consistent with applicable laws and regulations:

"* * *

"B. To hire, promote, transfer, assign, and retain employees in positions within the bargaining unit, and to suspend, demote, discharge or take other disciplinary action against such employees;

"* * *

"E. To relieve employees from duties because of lack of work or for other legitimate reasons."

Article 16.1: "It is agreed that an Appointing [A]uthority may dismiss, demote or suspend an employee for just cause."

Article 16.4: "If within two weeks of such dismissal, demotion, or suspension, the employee or the Brotherhood so affected notifies the Appointing Authority in writing that he has been unfairly treated and gives his reasons therefore, he may have his case reviewed in accordance with the grievance and arbitration procedure set forth in this Agreement."

Criminal charges were also lodged against Mr. Algasso as a result of the search of his apartment. On February 11, 1997, at a Superior Court hearing on Mr. Algasso's motion to suppress the items seized during the February 1993 raid, the Superior Court found that the police had acted recklessly and with reckless disregard for the truth in obtaining the search warrant. As a result, the Superior Court suppressed the evidence obtained pursuant to the search warrant. Thereafter, on

July 11, 1997, the state dismissed the criminal charges against Mr. Algasso emanating from the search of his apartment.

In the meantime, however, on July 23, 1996, Mr. Algasso had been arrested on a separate and distinct charge of aiding and abetting another to commit a burglary—an incident completely unrelated to the 1993 charges. On March 12, 1997, Mr. Algasso pled *nolo contendere* to the charge, and received a four-year suspended sentence and five years of probation.

The grievance that was filed in 1993 was held in abeyance pending resolution of the criminal charges, but eventually was heard in 1998. On June 5 of that year, the hearing officer denied the grievance, finding that DOC had cause to terminate Mr. Algasso from state service. On June 25, 1998, RIBCO filed a demand for arbitration seeking review of the adverse grievance determination.[1]

Before the arbitration hearings began, RIBCO filed a motion *in limine* to exclude the evidence illegally seized in the 1993 search. The arbitrator denied the motion, finding that "based upon the circumstances of this case, application of the Exclusionary Rule to the evidence in question is not warranted." As a result the state was allowed to submit "photographs of, lists of, and in certain cases, actual items consisting of part of the material seized" in the search. The arbitrator commented that, given the suppression justice's "scathing indictment of the investigators," he would look with "enhanced scrutiny" at any statement contained in any of the investigators' reports before accepting such statement as factual. The arbitrator conducted hearings over four days in the spring and summer of 2001.

On October 1, 2001, the arbitrator ruled that the director had no just cause to terminate Mr. Algasso. The arbitrator addressed each of the charges separately.

With respect to the allegations of theft of food items and kitchen supplies from the DOC, the arbitrator found that the evidence did not substantiate the DOC investigators' assertions of any missing inventory. The arbitrator noted that because it lacked an inventory control system, the state was unable to prove that any food or supply items were, in fact, missing. Additionally, the arbitrator noted that the parties had stipulated to the fact that, with one exception, all the items were available to the public at various restaurant supply stores. Coupled with the fact that the arbitrator accepted Mr. Algasso's testimony that the items were used in a small catering side business that he operated out of his home, the arbitrator found that the state failed to prove that the seized items were the property of the DOC, that Mr. Algasso was guilty of theft, or that quantities of these items actually were missing from the DOC.

In addressing the allegations of the theft of the blankets and towels, the arbitrator found that, although Mr. Algasso did not dispute possessing the items, his method of obtaining them fell short of theft. The arbitrator noted that the DOC kitchen employees had engaged in an "extensive and long-term 'bootlegging'" of MHRH towels and linens for use in the DOC kitchen. The arbitrator noted that this "bootlegging" procedure appeared "somewhat shady," and involved getting access to the area where these towels and linens were stored by removing "loose boards." The

---

1. Mr. Algasso also filed an appeal with the Personnel Appeal Board on July 8, 1998, seeking to appeal the 1993 decision of the appointing authority terminating his employment. His appeal was dismissed for failure to file the appeal within thirty days, pursuant to G.L.1956 § 36–4–42, and also for electing to pursue a grievance and arbitration.

arbitrator also noted that the towels were placed underneath food items to prevent spills while these food items were transported by the DOC kitchen staff, including Mr. Algasso, and that Mr. Algasso used the blankets when he slept in his vehicle at the prison in periods of inclement weather. Furthermore, the arbitrator noted that there was no evidence that the DOC ever instructed any of its employees to treat the items "in any manner other than as disposable items to be used and discarded." The arbitrator reasoned that "the method of obtaining, using, and disposing of MHRH towels and blankets was such as to encourage viewing them as essentially disposable items of little or no value," and thus, Mr. Algasso had a reasonable basis to view them as disposable.

Concerning the allegations of drug possession, the arbitrator found that the absence of any laboratory tests establishing that the seized materials were illegal substances, combined with the "full deference" the arbitrator gave to the suppression justice's "scathing criticism of the investigators," was fatal to the state's attempt to prove this allegation.

In regard to the allegation of an illegal cable television hookup, the arbitrator noted that RIBCO had asserted, without rebuttal, that obtaining cable television channels illegally is a misdemeanor. The arbitrator emphasized that the DOC director testified that "there are correctional officers who have been convicted of misdemeanor offenses that remain on the job because those offenses have been * * * off duty misconduct which there wasn't a direct nexus to their employment in some of those incidents." The arbitrator concluded that Mr. Algasso's illegal cable hookup was a misdemeanor that occurred off duty and did not constitute a direct nexus to his employment, and thus did not represent just cause for termination.

On January 8, 2002, the arbitrator issued a written decision on the remedy for DOC's wrongful termination in which he reinstated Mr. Algasso effective April 25, 1993, to March 12, 1997, with full back pay ("less any and all outside earnings"), benefits, and statutory interest. The arbitrator granted the DOC sixty days from the date of the remedy award to take action in response to Mr. Algasso's 1997 nolo plea. On March 5, 2002, the DOC held a pre-disciplinary hearing addressing the effect of said plea on Mr. Algasso's employment. On March 8, 2002, the current director of the DOC, Ashbel T. Wall, notified Mr. Algasso that he was being fired, effective April 8, 1995, the alleged date of the criminal conduct. On April 3, 2002, Mr. Algasso tendered his resignation, effective March 11, 1997, the day before his nolo plea.

On April 5, 2002, pursuant to G.L.1956 § 28-9-18, the state filed a motion in Superior Court to vacate the arbitrator's award. Shortly thereafter, RIBCO filed a countermotion to confirm the arbitrator's award. The state argued that the arbitrator's findings were irrational, that the arbitrator exceeded his authority, and that the arbitrator improperly substituted his judgment for that of the director. RIBCO countered that the arbitrator's findings and conclusions were rationally based on the arbitrator's independent evaluation of the evidence before him.

After considering these arguments, the Superior Court justice ruled that the arbitrator's findings were not irrational, and that the arbitrator did not substitute his judgment for that of the director. The Superior Court justice also found that the arbitrator's award of back pay from April 25, 1993, to March 12, 1997, was rational and supported by the terms of the CBA and relevant DOC rules. Furthermore, the Superior Court justice ruled that Mr.

Algasso's post-discharge criminal conduct did not prohibit the award of back pay after that conduct. The Superior Court justice found that there was no evidence that the DOC discovered Mr. Algasso's misconduct in 1995, and noted that the DOC's Code of Ethics and Conduct expressly indicates that discipline is warranted upon a criminal conviction or a plea of *nolo contendere.* With respect to prejudgment interest, the Superior Court justice found that the doctrine of sovereign immunity insulates the state from paying interest, and that the state neither had expressly nor implicitly waived that protection. The Superior Court justice denied the state's motion to vacate the arbitrator's award of back pay and benefits and granted RIBCO's motion to confirm the arbitrator's award of back pay and benefits. He further granted the state's motion to vacate the arbitrator's award of prejudgment interest and denied RIBCO's motion to confirm the arbitrator's award of prejudgment interest.

### Standard of Review

■ At the outset, we note that judicial authority to review an arbitration award is statutorily prescribed and very limited. *Town of North Providence v. Local 2334 International Association of Fire Fighters, AFL-CIO,* 763 A.2d 604, 605

(R.I.2000). Limited judicial review of these proceedings is based on the strong public policy favoring private settlement of collective bargaining grievances. *Rhode Island Council 94, AFSCME, AFL-CIO v. State,* 714 A.2d 584, 588 (R.I.1998); *Belanger v. Matteson,* 115 R.I. 332, 356, 346 A.2d 124, 138 (1975). However, "[although public policy favors the final resolution of disputes * * * by arbitration, this policy relies on the premise that arbitrators act within their power and authority." *Town of Coventry v. Turco,* 574 A.2d 143, 147 (R.I.1990).

■ "The general rule is that '[absent a manifest disregard of a contractual provision or a completely irrational result, [an arbitration] award will be upheld.'" *Rhode Island Brotherhood of Correctional Officers v. State Department of Corrections,* 707 A.2d 1229, 1234 (R.I.1998) (quoting *Turco,* 574 A.2d at 146). The standard of review in this situation is governed by § 28-9-18(a), which requires a court to vacate an arbitrator's award in three circumstances.[2] Specifically, § 28-9-18(a)(2) states that an award must be vacated "[w]here the arbitrator or arbitrators exceeded their powers." An arbitrator may exceed his or her powers in one of several ways. "First, if the arbitration award does not 'draw[ ] its essence' from the

---

2. General Laws 1956 § 28-9-18 provides:

"**Grounds for vacating award.**—(a) In any of the following cases the court must make an order vacating the award, upon the application of any party to the controversy which was arbitrated:

(1) When the award was procured by fraud.

(2) Where the arbitrator or arbitrators exceeded their powers, or so imperfectly executed them, that a mutual, final, and definite award upon the subject matter submitted was not made.

(3) If there was no valid submission or contract, and the objection has been raised under the conditions set forth in § 28-9-13.

"(b) A motion to vacate, modify, or correct an arbitrator's award shall not be entertained by the court unless the award is first implemented by the party seeking its vacation, modification, or correction; provided, the court, upon sufficient cause shown, may order the stay of the award or any part of it upon circumstances and conditions which it may prescribe.

"(c) If the motion to vacate, modify, or correct an arbitrator's award is denied, the moving party shall pay the costs and reasonable attorneys' fees of the prevailing party."

[CBA] or is not based upon a 'possibly [*sic*] plausible' interpretation thereof, a court may determine that the arbitrator manifestly disregarded a contractual provision or reached an irrational result and thereby exceeded his or her authority." *Rhode Island Brotherhood of Correctional Officers,* 707 A.2d at 1234. Second, an arbitration award will be vacated if, for example, the issue determined was not arbitrable in the first place. *See, e.g., Rhode Island Court Reporters Alliance v. State,* 591 A.2d 376, 378–79 (R.I.1991). Similarly, an arbitrator may exceed his or her powers by interpreting a CBA in such a way that it contravenes state law or other public policies that are not subject to alteration by arbitration. *See State Department of Mental Health, Retardation, and Hospitals v. Rhode Island Council 94, A.F.S.C.M.E., AFL–CIO,* 692 A.2d 318, 321–22 (R.I.1997) (vacating arbitration award when arbitrator exceeded his powers because the dispute was nonarbitrable and the submission of the dispute to arbitration constituted an unlawful usurpation of statutory authority).

Recognizing that "the role of the judiciary in the arbitration process is 'extremely limited,'" *Purvis Systems, Inc. v. American Systems Corp.,* 788 A.2d 1112, 1114 (R.I.2002), we are nevertheless of the opinion that in this case the arbitrator reached an irrational result, and impermissibly substituted his judgment for that of the director for reasons hereinafter set forth.

### "Bootlegged" Towels

■ At the commencement of the arbitration hearings RIBCO filed a motion *in limine* to prohibit introduction of any evidence that had been suppressed in the criminal proceedings. The arbitrator properly denied the motion and permitted the state to submit evidence of the items seized in February 1993. Among the items seized was a large garbage bag con-taining fourteen towels marked "Prop. of MHRH" and a plastic bag containing bedspreads or blankets, also signifying MHRH's proprietary interest.

At the arbitration hearing George H. Truman, Jr., the former associate director of Food Services at the DOC, testified that Mr. Algasso was assigned to the Center Kitchen Facility at the ACI complex. He indicated that a corridor led from the kitchen building to the MHRH laundry room. The corridor had been blocked off, but the boards "were basically loose, and we would routinely go in there * * * [t]o borrow towels and things they use for cleaning in the kitchen." He further testified that although DOC personnel never were given permission to take the towels, they would "barter" with nurses for them "because nothing cleans up better in a kitchen than terry cloth." Consequently, kitchen personnel would "bootleg" them from the laundry. However, he said, "there is no established procedure that would entitle employees to take them home for personal use; because there's not even a policy or an entitlement to use them in the kitchen, never mind take them home."

Michael P. Rigney, the DOC supervisor for Food Services and Mr. Algasso's immediate supervisor, explained that the towels were used for rags and potholders. They were often used when stewards were required to use their own vehicles to transport food to various DOC facilities. Dampened towels also were used to keep certain foods, such as cooked turkeys, moist during transportation.

Mr. Algasso's testimony was consistent with that of his supervisors. Although denying that he ever procured towels directly from the MHRH laundry, he acknowledged that they were available in the kitchen facility and used for food prepara-

tion, carrying pans, and washing cars. He also testified that he used the MHRH blankets when he would spend the night on ACI grounds because of snowstorms. On such occasions he would sleep in his van "because there was the rats in there, the mice, the cats and cockroaches."

In his award, the arbitrator said, "it is reasonable to conclude that [DOC] employees engaged in extensive and long-term 'bootlegging' of what was property belonging to another State department." Yet he went on to determine that, although "[i]n an ideal world," Mr. Algasso should have returned the towels, his acquisition of the items fell short of theft. The arbitrator reasoned that even though Mr. Algasso clearly possessed state property, this did not amount to theft, even though some of the items were obtained through the "somewhat shady" method of "bootlegging" and removing "loose boards." The arbitrator also noted that there was no evidence that the DOC ever instructed any of its employees to treat the items "in any manner other than as disposable items to be used and discarded." The arbitrator opined that "the method of obtaining, using, and disposing of MHRH towels and blankets was such as to encourage viewing them as essentially disposable items of little or no value," and thus, Mr. Algasso had a reasonable basis to view them as disposable. We conclude, however, that such a result is not only irrational, it also impermissibly usurps the disciplinary function of the director.

The DOC Code of Ethics and Conduct, promulgated pursuant to the director's authority under G.L.1956 § 42–56–10, prohibits the following conduct:

Section V(F)(7)(a): "Theft."

Section V(F)(9)(a): "Using state property, either by intention or through negligence, in a manner which causes damage or injury, or unnecessarily diminishes its value."

Section V(F)(9)(e): "Removing state property from departmental premises without the permission of a superior, or for other than the performance of one's duties."

The towels and linens clearly were state property, regardless of how Mr. Algasso obtained possession of them. The fact that the DOC lacked a specific policy prohibiting the use of MHRH linens does not equate with permission to remove the property from departmental premises. Furthermore, the fact that DOC employees may have considered the towels to be of little value is irrelevant. The DOC Code of Ethics and Conduct prohibits the theft or removal of state property regardless of the intent of the employee or its value. Furthermore, the DOC Code of Ethics and Conduct states that employees who violate the sections referred to above may be subject to "disciplinary measures, up to and including termination." DOC Code of Ethics and Conduct Section V(F). As we previously have stated, the Legislature has delegated the determination of the extent and severity of discipline to the DOC director and that determination is not subject to review by an arbitrator. *See State Department of Corrections v. Rhode Island Brotherhood of Correctional Officers,* 725 A.2d 296, 299 (R.I.1999) (*Riel*) ("The Legislature could not have intended to make the paramount disciplinary function of the director subject to the caprice of an arbitrator."). Director Vose determined that "any one of the charges regarding theft * * * standing alone, warrant discharge." A violation of the DOC Code of Ethics and Conduct having been established, the appropriateness of the disciplinary measures to be invoked lies within the discretionary authority of the director. The arbitrator lacked the au-

thority to alter or determine the discipline imposed. Thus, the arbitrator's decision to reverse the director's termination of Mr. Algasso was irrational and the arbitrator exceeded his powers by substituting his judgment for that of the director concerning the choice of discipline.

### Cable Television Converter Box

■ At the arbitration hearing, Mr. Algasso admitted that in February 1993 he had a box connected to his television that allowed him to receive pay channels without paying for them. He said that he also had two or three broken converter boxes that he was trying to learn how to fix.

As the arbitrator found, and both parties agree, the wrongful obtaining of telecommunication service is a misdemeanor offense.[3] The arbitrator, however, was persuaded that the testimony of Director Wall was

> "dispositive on the question of how that 'misdemeanor' should have been handled. He was asked if ' * * * a criminal offense * * * a conviction, is * * * automatic grounds for dismissal * * *.' Director Wall responded, 'We look at the conduct that underlies the criminal charge.' Director Wall went on to testify that 'every case has to be looked at on its own terms within the parameters of our departmental policies and the Code of Ethics and Conduct.' He further testified that ' * * * there are correctional officers who have been convicted of misdemeanor offenses that remain on the job because those offenses have been— have been off duty misconduct which there wasn't a direct nexus to their employment in some of those instances.' I am satisfied Mr. Algasso's illegal arrangement to secure cable channels to

which he was not entitled was a 'misdemeanor' which occurred 'off duty' and which did not constitute ' * * * a direct nexus to [his] employment * * *.' As such, under the Department practice as testified to by Director Wall, that illegal cable use does not represent just cause for termination."

We are of the opinion, however, that the arbitrator has substituted his judgment about what the appropriate disciplinary action should be for that of the DOC director. The arbitrator's conclusion, therefore, is inconsistent with § 42–56–10, which outlines the powers of the director "in light of the director's nondelegable authority to maintain security, safety, and order at all state correctional facilities. Section 42–56–10(2)." *Riel*, 725 A.2d at 298.

The *Riel* case involved a correctional officer who had been convicted of an off-duty misdemeanor. Here, Mr. Algasso was not convicted, indeed the criminal charges were dismissed. Nevertheless, the charge was "factually substantiated" after an administrative hearing, and Mr. Algasso admitted to obtaining cable service without paying for it at the arbitration hearing. The misconduct clearly occurred off duty, but as we said in *Riel*, "[w]e believe that the Legislature did not intend the director under a CBA to abdicate the disciplinary function to an arbitrator in light of the awesome responsibility that is imposed upon the director." *Id.*

The efficacy of this principle is apparent from the testimony of Director Wall:

> "If an inmate is aware or discovers that a staff member is engaged in misconduct, that inmate then has something on the staff member, that inmate has

---

**3.** The information charging Mr. Algasso, which was dismissed, alleged violations of

G.L.1956 §§ 11–35–16 and 11–35–25.

leverage over the staff member. It can be used for extortion and blackmail and to undermine confidence in the performance of staff; and those translate into security breaches."

On cross-examination, Director Wall did acknowledge that every case must be reviewed on its own terms, and the conduct underlying a criminal charge examined. But he also said that "certainly there are situations for whatever reason somebody may not be charged criminally but * * * it still is an episode or an incident that has compromised our security, and we will make decisions on that basis."

He further testified, "[o]ur practice has been that if a misdemeanor conviction is related to the performance of [one's] duties on the job, the underlying conduct justifies termination, that if it is not directly related to performance on the job it may not lead to termination."

The determination of whether a sufficient relationship exists between the employee misconduct and performance on the job, however, has been statutorily delegated to the director under the provisions of § 42–56–10(7), which empowers the director to "[h]ire, promote, transfer, assign, and retain employees and suspend, demote, discharge, or take other necessary disciplinary action."

We also are not persuaded that by failing to reference the illegal cable box as a specific ground for termination in his letter of April 14, 1993, Director Vose was expressing his judgment that such conduct did not warrant discharge. Director Vose wrote, "any one of the charges regarding theft, possession of stolen items, or possession of marijuana and cocaine, standing alone, warrant discharge." We conclude, rather, that in this context his use of the word "theft" was comprehensive enough to include the wrongful obtaining of telecommunication service.

As with the purloined towels, the evidence before the arbitrator clearly established an incident of employee misconduct. The fact that the arbitrator did not deem the infractions to be worthy of termination is of no significance to his responsibilities, or to our analysis. The Legislature has entrusted the director of DOC with the sole responsibility to determine the appropriate disciplinary action.

## Conclusion

The orders of the Superior Court therefore are reversed, and the arbitrator's award is vacated. Because of our holding, we need not reach the issue of whether the arbitrator's award of prejudgment interest was appropriate. The papers of this case are remanded to the Superior Court with instructions to enter judgment for the state in accordance with this opinion.

FLAHERTY, J., with whom ROBINSON, J., joins dissenting.

We respectfully dissent from the holding of the majority in this case. In so doing, we note that the majority has correctly set forth the demanding standard of review of an arbitrator's award as stated in *Rhode Island Brotherhood of Correctional Officers v. State Department of Corrections*, 707 A.2d 1229, 1234 (R.I.1998), that "'absent a manifest disregard of a contractual provision or a completely irrational result, [an arbitrator's] award will be upheld.'" Where we depart from the majority is in its assessment that the arbitrator's award was irrational.

## Relevant Facts

This case involves an employee of the Department of Corrections, Anthony Algasso, who was charged both criminally and departmentally with a variety of offenses. As set forth in the majority opinion, those offenses arose primarily from a

raid at Algasso's home, pursuant to a search warrant issued by a Superior Court justice. When the search of Algasso's home allegedly revealed drugs and drug paraphernalia, food stuffs and linen purportedly stolen from the state, and illegal cable boxes, Algasso was charged with a variety of criminal offenses. As a result of those charges, Algasso was terminated from his position as a kitchen steward at the Department of Corrections, effective April 25, 1993. The Rhode Island Brotherhood of Correctional Officers (RIBCO) filed a timely grievance on Algasso's behalf contesting his termination.

Meanwhile, the criminal charges against Algasso proceeded in the Superior Court. A pretrial suppression hearing was conducted by the Court on February 11, 1997, with respect to the items seized in the 1993 raid on Algasso's home. After a hearing and an examination of the affidavits and the police investigation conducted prior to the search of those premises, the trial justice suppressed all evidence seized. He noted reckless conduct on behalf of the Johnston police in its investigation and in the preparation of affidavits. The hearing justice determined that, based on the totality of the circumstances, Algasso had proven by a preponderance of the evidence that the police had engaged in reckless disregard for the truth. All criminal charges stemming from the search subsequently were dismissed.[4]

For reasons unclear to this Court, arbitration hearings did not commence in connection with Algasso's 1993 termination until March 2000. Between then and June of that year, a series of hearings were conducted before an arbitrator on the issue of whether there was just cause to terminate Algasso.[5] In a written decision issued on October 1, 2001, the arbitrator found that the state did not have just cause to fire Anthony Algasso. With respect to the food and linens seized at Algasso's home, the arbitrator found insufficient evidence that either had been stolen from the prison. He noted that a supervisor of Algasso had testified that although most of the food item brands seized at Algasso's home could be found in the prison kitchen, there were no reports of any food items missing during the period in question, and that those items also could be purchased on the market. Uncontradicted testimony was presented to the arbitrator that Algasso ran a small catering business out of his home, which tended to support his assertion that he legitimately obtained the food for that purpose.

With regard to the linens, the arbitrator concluded that the linens were "throwaways," as testified to by prison officials, and that Algasso had been called upon to use the linens in his vehicle to deliver food to other prison facilities as part of his duties. Therefore, the arbitrator reasoned, Algasso should not be regarded as stealing that which was intended to be discarded. Moreover, even though there was significant testimony from management personnel at the Department of Corrections that linens were "bootlegged" from the Department of Mental Health, Retardation and Hospitals (MHRH) by removing loose boards, there was absolutely

---

4. In a separate incident, Algasso was charged with aiding and abetting in a burglary between March 8 and April 8, 1995. On March 12, 1997, he entered a plea of *nolo contendere* to that charge. The department, however, was unaware of this charge until such time as he entered his plea, and it was not a factor in his 1993 termination.

5. Section 16.1 of Article 16 of the Collective Bargaining Agreement between the parties provides: "It is agreed that the appointing authority may dismiss, demote or suspend an employee for just cause."

no evidence that Algasso had obtained any of the linens in that manner, but only that they were available in the DOC kitchen where he worked.

With respect to the allegations of drug use, the arbitrator gave great weight to the lack of evidence before him regarding the nature of the alleged drugs seized from Algasso's home. No evidence of laboratory or even field testing was presented to verify that the substances seized were in fact cocaine or marijuana. The arbitrator therefore considered the state to have fallen short of its burden of proving that drugs were seized in Algasso's home.

It is certainly worth mentioning that the state presented no live testimony whatsoever in the arbitration hearings. The arbitrator accepted police and investigatory documents into evidence with respect to the 1993 search and seizure of Algasso's residence, despite their hearsay nature. He also correctly found that the exclusionary rule did not apply to the arbitration process, and therefore allowed the results of the search and seizure to come into evidence before him. However, in his decision, he guardedly considered the findings of the trial justice in the 1997 suppression hearing and the criticisms that the justice lodged against the reckless conduct of the Johnston police. The arbitrator pointedly noted that the justice's findings were only one of many factors that he considered.

Finally, with respect to the illegal cable boxes in Algasso's residence, the arbitrator considered the testimony of the acting director of the department, Ashbel T. Wall, in which the director said that not all minor offenses committed off the job were grounds for termination; rather there had to be some nexus found between the offense and the job for termination to be warranted. The arbitrator therefore found that there was no just cause for firing Algasso based upon the 1993 charges. He did not consider Algasso's subsequent 1995 misconduct in his just cause determination, but did allow the state sixty days to pursue disciplinary action in that regard.[6]

In a remedial decision issued on January 8, 2002, the arbitrator awarded Algasso reinstatement to his former position as kitchen steward with full back pay, including statutory prejudgment interest from April 25, 1993, through March 12, 1997, the day of his *nolo* plea to the 1995 charges. In so doing, the arbitrator cited the departmental code of ethics and conduct, which states as one ground for termination a *"[f]inding* of guilt or a *plea of nolo contendere* to a criminal charge." (Emphasis added.)

### Analysis

In its opinion the majority has acknowledged the "extremely limited" role of the judiciary with respect to the arbitration process. *See Purvis Systems, Inc. v. American Systems Corp.*, 788 A.2d 1112, 1114 (R.I.2002); *Rhode Island Council 94, AFSCME, AFL–CIO v. State*, 714 A.2d 584, 587 (R.I.1998). The majority also says that it is abiding by the principle that the Court should "not reconsider the merits of an award despite allegations that it rests upon errors of fact or on a misinterpretation of the contract." *Rhode Island Council 94*, 714 A.2d at 588 (citing *United*

---

**6.** The state held a disciplinary hearing with respect to Algasso's 1995 misconduct in March 2002, charging him with conduct unbecoming a correctional employee in violation of the department's code of ethics and conduct. On March 8, 2002, Algasso was terminated from his job, effective April 8, 1995, the alleged date of the misconduct. However, in an April 3, 2002 letter, Algasso resigned from his position effective March 11, 1997, the day before the entry of his *nolo* plea for the 1995 charges.

*Paperworkers International Union, AFL–CIO v. Misco, Inc.,* 484 U.S. 29, 36, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987)).

It appears to us, however, that in its holding in this case, the majority has, in fact, substituted its judgment for the judgment of the arbitrator, thereby undermining the strong public policy encouraging the private settlement of labor grievances through the relatively inexpensive and expedient means of arbitration. *Id.*; *see also Purvis Systems Inc.,* 788 A.2d at 1118.[7]

In our view there is no reason to disturb the arbitrator's determination of a lack of just cause in this case. The arbitrator gave careful consideration to the contractual provisions of the collective bargaining agreement, the terms of the code of ethics and conduct, and the practices and termination policies enforced by the department. Upon due regard for all the testimony presented at the arbitration hearings, and carefully weighing the evidence with an eye for how such evidence was obtained, we believe that the arbitrator's award of reinstatement was not irrational and did not conflict with the provisions of the collective bargaining agreement.

We also distinguish this case from those cases in which this Court has held an arbitrator to have improperly substituted his judgment for that of the director of the Department of Corrections, or exceeded his powers in altering the discipline imposed. In those cases, the conduct of the correctional officer had a direct nexus to the job, clearly compromised security at the facility, or was egregious. *See State v. Rhode Island Brotherhood of Correctional Officers,* 819 A.2d 1286, 1289 (R.I. 2003) (holding that the arbitrator did not have authority to alter the discipline from termination to sixty-day suspension for misplacing a key found in an inmate's possession); *see also State Department of Corrections v. Rhode Island Brotherhood of Correctional Officers,* 725 A.2d 296, 299 (R.I.1999) (the *Riel* case) (arbitrator erroneously and irrationally changed director imposed termination to thirty-day suspension for officer convicted and incarcerated for driving under the influence); *cf. State Department of Children, Youth and Families v. Rhode Island Council 94,* 713 A.2d 1250, 1259 (R.I.1998) (arbitrator exceeded powers when he found department lacked just cause to dismiss employee convicted of violent crimes).

In its holding, the majority cites *Riel* for the principle that the extent and severity of discipline is left to the DOC director and that that determination is not subject to review by an arbitrator. However, even a cursory review of the *Riel* case reveals that it is factually distinguishable from the matter now before us, and that the majority's reliance on it is misplaced.

In *Riel,* the correctional officer was charged and convicted of driving while intoxicated in Massachusetts, and subsequently sentenced to a period of confinement. The grievant in that case failed to give notice of her arrest until after her conviction, in direct contravention of the departmental code of ethics. In denying the union's appeal from a Superior Court judgment vacating the award of an arbitrator reducing a termination to a thirty-day suspension, this Court cited the security implications involved in operating a prison and held that it was the director, not an arbitrator, who was responsible for the " 'consequences of a previously convicted and incarcerated officer filling a security

---

7. We do not imply that we would have reached the same result as the arbitrator in this case. However, the issue before this Court is whether the result actually reached by the arbitrator was irrational. We do not believe that it was.

post at the adult correctional institutions.'" *Riel,* 725 A.2d at 298.

We believe that *Riel* should be restricted to its somewhat unusual facts, which differ substantially from the factual pattern present here. In this case, the department was well aware of the charges filed against its employee even before the employee was presented to the Superior Court, eliminating any risk to security that may be engendered by an inmate learning of the incident and compromising the employee. More importantly, *Riel* involved a conviction, not present here because all charges against Algasso arising from the 1993 raid were dismissed.

Finally, *Riel* involved an acknowledgment by the arbitrator that discipline was warranted, even as the arbitrator lessened the penalty from termination to suspension. Under the circumstances presented in that case, this Court determined the reduction impermissible, balancing the language present in the collective bargaining agreement with the director's responsibility under G.L.1956 § 42–56–10.[8]

In this case, however, the arbitrator did not lessen the penalty, but ruled that there was no just cause for discipline in the first place, the very issues submitted to arbitration by the parties. We do not believe that he was "completely irrational" in doing so and respectfully submit that the majority has simply substituted its judgment for his.

### Conclusion

For those reasons, we would affirm the order of the Superior Court.

---

8. General Laws 1956 § 42–56–10 provides in pertinent part:

"In addition to exercising the powers and performing the duties which are otherwise given to him or her by law, the director of the department of corrections shall:

"(1) Designate, establish, maintain, and administer those state correctional facilities that he or she deems necessary, and may discontinue the use of those state correctional facilities that he or she deems appropriate for that action;

"(2) Maintain security, safety, and order at all state correctional facilities, utilize the resources of the department to prevent escapes from any state correctional facility, take all necessary precautions to prevent the occurrence or spread of any disorder, riot, or insurrection of any state correctional facility, including but not limited to the development, planning, and coordination of emergency riot procedures, and take suitable measures for the restoration of order;

"* * *

"(6) Direct employees in the performance of their official duties;

"(7) Hire, promote, transfer, assign, and retain employees and suspend, demote, discharge, or take other necessary disciplinary action * * *."

The collective bargaining agreement also included a provision "granting the employer the right to suspend, demote, discharge, or take other disciplinary action against employees." *State Department of Corrections v. Rhode Island Brotherhood of Correctional Officers,* 725 A.2d 296, 298 (R.I.1999). On the other hand, the right of the director is restricted by the collective bargaining agreement, which limits the imposition of discipline to "just cause." Section 16.1 of Article 16 of the Collective Bargaining Agreement.