**CITY OF EAST PROVIDENCE**

v.

**UNITED STEELWORKERS OF AMERICA, LOCAL 15509.**

**United Steelworkers of America, Local 15509**

v.

**City of East Providence.**

Nos. 2006–145–Appeal, 2006–162–Appeal.

Supreme Court of Rhode Island.

June 27, 2007.

William J. Conley, Jr., East Providence, for Plaintiff.

Richard M. Peirce, Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice SUTTELL, for the Court.

It has been said that "a rose is a rose is a rose,"[1] but it does not necessarily follow that an appeal is an appeal is an appeal—especially if that appeal arose from a rather thorny arbitration. The sweeping yet puzzling waiver of all rights of appeal found in the arbitration provisions of the collective bargaining agreement (CBA) negotiated by the City of East Providence (the city) and United Steelworkers of America, Local 15509 (the union), is perhaps as infirm as the rabid raccoon that first set in motion the controversy we now confront. As a result, before this Court may consider the arbitrator's ultimate award or its subsequent partial vacation in Superior Court, we first must determine what effect, if any, to give to a curious clause that removes from both parties the option to "appeal" a decision that is not, technically speaking, subject to appeal.

The union appeals from two Superior Court judgments in which the Superior Court (1) denied its motion to confirm an arbitrator's award on a grievance that the union had filed after the city decided to terminate the animal control supervisor,

---

1. This familiar line comes from the poem, "Sacred Emily," written by Gertrude Stein in 1913, and first published in her 1922 collection of poems, stories and essays entitled *Geography and Plays*. Stein (1874–1946) was an American poet, novelist, and critic, but was perhaps most famous for her years as an expatriate in Paris, where she was at the center of a celebrated literary and artistic circle that included painters such as Pablo Picasso, Henri Matisse and Georges Braque, and writers Ernest Hemingway, F. Scott Fitzgerald, and Sherwood Anderson, among others. Benet's Reader's Encyclopedia 979 (4th ed. 1996).

John Smith (Mr. Smith or grievant), and (2) granted the city's motion to vacate that award to the extent the arbitrator reinstated the grievant to the position of police dispatcher. In what is perhaps an unintended act of legal irony, the union has invoked the waiver of appeal clause to champion its own appeal, contending that the city's motion to vacate fell within the proscription of that waiver. The union also alleges that the hearing justice erred in ruling that the arbitrator had exceeded his authority by ordering the city to reinstate Mr. Smith to a lesser position. For the reasons set forth in this opinion, we affirm the judgments of the Superior Court.

## I

### Facts and Procedural History

On May 4, 2004, Mr. Smith, then the animal control supervisor for the East Providence Animal Shelter (EPAS), received a call from his father about some animal noises that apparently were coming from the attic of his father's East Providence residence. Mr. Smith trapped an adult raccoon and removed it from the house, but the noises persisted. Upon further investigation, Mr. Smith discovered five infant raccoons, which were only a few days old. Mr. Smith deemed the raccoons too young to survive on their own, so instead of releasing them he brought them back to EPAS. At his arbitration hearing, Mr. Smith testified that after his attempts to place the raccoons with two animal rehabilitators were unsuccessful, he asked Tracey Blackledge, a part-time employee at EPAS, to care for the raccoons at her home. She agreed, and about a month later, after animal control officers removed another infant raccoon from a local golf course, Ms. Blackledge took in a sixth little boarder. The raccoons, however, did not remain little for long, and by July 2004

they had outgrown the cage at Ms. Blackledge's house, so Mr. Smith had them brought to EPAS and placed in a kennel. He planned to keep them there until they were old enough to be released into the forest and fend for themselves.

During the raccoons' stay at the kennel, they apparently became something of an attraction. A number of people, including employees of the city garage adjacent to EPAS, came into direct, physical contact with the raccoons. The staff at EPAS allowed a number of visitors to enter the raccoons' kennel and provided virtually no warnings about the potential danger of such interactions. In fact, a number of witness statements that were collected for the arbitration hearing indicate that some EPAS employees, including Mr. Smith himself, were rather casual about taking the raccoons with them out into the community, as if they were domesticated pets. But when one of the raccoons began exhibiting signs of rabies, Mr. Smith ordered it to be quarantined. Eventually, the animal's condition deteriorated, so Mr. Smith had it euthanized and sent its remains to a state lab for testing. When the test results came back positive for rabies, Mr. Smith notified the East Providence Police Department and complied with the police chief's request that he file a written report. Mr. Smith also issued a press release to warn citizens of the city about the possible exposure. Although there were no recorded instances of people contracting the disease, fifty-six people received rabies shots administered by the Division of Disease Prevention and Control for the State of Rhode Island.

The East Providence Police Department initiated an investigation of EPAS, and Lieutenants Richard Frazier and John Wyrostek uncovered a number of irregularities and violations that occurred during Mr. Smith's tenure. The police depart-

ment submitted a completed investigation package to city manager William J. Fazioli on August 11, 2004, and two days later on television, the local evening news reported the imminent termination of the entire EPAS staff.

On August 14, 2004, Mr. Smith received a letter, dated August 13, 2004, informing him that he was "being suspended without pay for five (5) days in accordance with Personnel Ordinance Section 11–69(b) and * * * terminated from employment with the City of East Providence effective at the end of that five (5) day suspension." As grounds for Mr. Smith's termination, the letter listed three alleged violations of state laws, three violations of the Code of Conduct–East Providence Police Department's Manual of Procedures, and a violation of a department memorandum. It also reprimanded Smith for boarding his own pet dog at the animal shelter and allowing other city employees to do the same. The violations all emanated from Mr. Smith's mishandling of the raccoons—from his failure to place them with a licensed wildlife rehabilitator to his failure to effectively quarantine the animals and to his flawed record-keeping concerning their short lives.

During their investigation, the police contacted Mr. Smith to request that he provide them with a statement on the raccoon situation, but because Mr. Smith was hospitalized for treatment of a pulmonary embolism between July 26 and August 6, 2004, there were some understandable delays. When Mr. Smith was well enough to leave the hospital, he contacted Lt. Frazier and asked whether any statement he might give would have implications for any criminal charges that might be raised. When Lt. Frazier indicated that it would, Mr. Smith said he wanted to reconsider the advisability of giving a statement, and ended the conversation. After consulting with an attorney, Mr. Smith decided against giving a statement, and he made no further attempt to speak with investigators.

On August 18, 2005, the union filed a grievance with the city over Mr. Smith's suspension and termination. The grievance process did not resolve the matter, and the parties proceeded to arbitration in accordance with the terms of their CBA. The arbitrator convened five hearings between June 1 and August 31, 2005, to hear testimony and receive documentary evidence and, after post-hearing briefs were submitted, he rendered his opinion and award on November 18, 2005. Two issues were framed for arbitration: (1) "Did the City afford the grievant the constitutional due process to which he was entitled, in the form of a pre-disciplinary hearing?" (2) "Did the City have just cause to suspend and terminate John Smith? If not, what shall the remedy be?" Before tackling the facts of the case, the arbitrator noted that although both parties had agreed that the "just cause" question was properly before him, there was some disagreement about the relevance of the due process question.

The arbitrator's fifty-four page decision included an exhaustive review of the facts and a thorough analysis of the issues. Yet, as nuanced and detailed as the decision and award were, the end result managed to leave both parties with reasonable grounds for claiming victory. The arbitrator determined that the city had just cause to terminate Mr. Smith as supervisor of EPAS, but because he also ruled that the city had not given Mr. Smith the requisite due process before his termination, the arbitrator ordered the city to "reinstate" him to the position of police dispatcher, a post Mr. Smith formerly had held about ten years earlier. The arbitrator addressed the due process and just cause

issues separately, and although he noted several times in his due process analysis that due process is a necessary element of just cause, he included the following two determinations among the five final points listed in the "award" section:

"1. The City did not afford the grievant the constitutional due process to which he was entitled in the form of a pre-disciplinary hearing.

" \* \* \*

"4. The City did have just cause to suspend and terminate the grievant. The discipline imposed thereby is adjusted in accordance with, and for the reasons stated in, this Award."

In response to a supplemental brief the city submitted on the due process issue, the arbitrator issued a supplemental decision on December 10, 2005, that confirmed the November 18 decision in all respects.[2]

The union filed a motion to confirm the arbitration award in Superior Court on December 22, 2005, and the city responded on January 5, 2006, with a motion to vacate the award. The next day the city also filed an objection to the union's motion to confirm, followed by a motion to stay, on January 9, 2006. On January 27, 2006, the hearing justice granted a stay of the award, and on February 7, 2006, he conducted a consolidated hearing on the motion to confirm, the objection to the motion to confirm, and the motion to vacate.

At the hearing, the union asserted that the arbitrator was completely justified in fashioning an independent remedy, even after he had determined that the city had just cause to terminate Mr. Smith. The city countered that once the arbitrator had found just cause for Mr. Smith's termination, the inquiry before him should have been at an end, and "the arbitrator had no authority to substitute his judgment for the employer as to what the appropriate sanctions should be." The hearing justice agreed with the city, and granted its motion to vacate "to the extent that the Arbitrator's remedy reinstating the grievant to the police dispatcher position is vacated." In a separate judgment, the hearing justice denied the union's motion to confirm. The union timely filed notices of appeal with respect to both judgments.

## II

### Standard of Review

■ In reviewing the waiver of appeal provision of the CBA, we are mindful that although virtually any clause can be cloaked in ambiguity by a savvy attorney, "the question is not whether there is an ambiguity in the metaphysical sense, but whether the language has only one reasonable meaning when construed, *not in a hypertechnical fashion, but in an ordinary, common sense manner." Garden City Treatment Center, Inc. v. Coordinated Health Partners, Inc.*, 852 A.2d 535, 542 (R.I.2004) (quoting *Textron, Inc. v. Aetna Casualty and Surety Co.*, 638 A.2d 537, 541 (R.I.1994)). When reviewing contracts, it is clear that this Court "should not, however, stretch its imagination in order to read ambiguity into a [contract]

---

**2.** On November 3, 2005, the city sent a letter to the American Arbitration Association (AAA) requesting that the due process issue be removed from the arbitrator's consideration, and that those sections of the union's brief that pertained to due process be struck. In the alternative, the city sought leave to file a supplemental brief on the due process issue. The union responded on November 18, 2005, and the AAA forwarded both letters to the arbitrator that day. The arbitrator had mailed his decision to AAA on November 18, 2005, and did not receive the forwarded packet containing the city's request and the union's response until November 21, 2005. The arbitrator denied the city's request to remove the due process issue from consideration, but did review the city's supplemental brief on the subject before issuing his supplemental decision on December 10, 2005.

where none is present." *Id.* (quoting *Textron,* 638 A.2d at 539).

■ As for judicial review of the arbitration award itself, the general rule is that "[a]bsent a manifest disregard of a contractual provision or a completely irrational result, [an arbitration] award will be upheld." *State Department of Corrections v. Rhode Island Brotherhood of Correctional Officers,* 867 A.2d 823, 828 (R.I. 2005) (quoting *Rhode Island Brotherhood of Correctional Officers v. State Department of Corrections,* 707 A.2d 1229, 1234 (R.I.1998)). On appeal, this Court reviews arbitration awards, as does the Superior Court, in accordance with G.L.1956 § 28–9–18(a), which *requires* the court to vacate an arbitrator's award in three specific circumstances. *State Department of Corrections,* 867 A.2d at 828–29; *see also Rhode Island Council 94, AFSCME, AFL–CIO v. State,* 714 A.2d 584, 589 (R.I.1998). Only one of those three circumstances is at issue in the instant appeal: under § 28–9–18(a)(2), the court must vacate an award "[w]here the arbitrator or arbitrators exceeded their powers." *State Department of Corrections,* 867 A.2d at 828. An arbitrator exceeds his or her powers "by resolving a non-arbitrable dispute or if the award fails to 'draw its essence' from the agreement, if it was not based upon a 'passably plausible' interpretation thereof, if it manifestly disregarded a contractual provision, or if it reached an irrational result." *Woonsocket Teachers' Guild, Local 951, AFT v. Woonsocket School Committee,* 770 A.2d 834, 837 (R.I.2001) (quoting *State Department of Children, Youth and Families v. Rhode Island Council 94,* 713 A.2d 1250, 1253 (R.I.1998)).

## III

### Discussion

#### A. The Waiver of Appeals Clause

■ Although the hearing justice never expressly addressed the union's contention that the city had waived the right to appeal the arbitrator's award, in reaching the merits of that award, he impliedly rejected the waiver argument.

Section 9.07 of the CBA between the union and the city reads: "It is hereby specifically agreed that the decision of the arbitrator shall be final and binding upon the parties and all rights of appeal by either party to any court, tribunal, etc. are hereby expressly waived." The union asserts that, on the surface, there is nothing inherently ambiguous about a waiver of appeal; the clause means that both parties agreed to forgo appeals of any kind and abide by the decision of the arbitrator. The city counters that the clause as written is a nullity, because there is no right to appeal an arbitrator's award in any case. *See Dutson v. Nationwide Mutual Insurance Co.,* 119 R.I. 801, 805, 383 A.2d 597, 599–600 (1978). Moreover, the city contends that it was the union's motion to confirm that brought the arbitration award before the court in the first place. Given the imprecise use of the general term "appeal" in a clause dealing specifically with the parties' post-arbitration rights, we cannot say that the interpretation touted by either side is unreasonable.

■ Although it is true in a very literal sense that chapter 9 of title 28 confers no right of "appeal" on a party aggrieved by an arbitrator's award, § 28–9–18 does offer the option of filing a motion to vacate that award. Black's Law Dictionary 105 (8th ed. 2004) defines appeal as "[a] proceeding undertaken to have a decision reconsidered by a higher authority; esp[ecially], the submission of a lower court's or agency's decision to a higher court for review and possible reversal." It is well settled that this Court will eschew a hypertechnical interpretation of a contract

term in favor of a more commonplace construction. *See Garden City Treatment Center, Inc.*, 852 A.2d at 542. Based on the plain, ordinary, and common meaning of "appeal," we conclude that in the statutorily constructed confines of labor arbitration, a motion to vacate is the functional equivalent of an appeal.[3] Yet while the city's filing of a motion to vacate may have violated the wooly waiver clause found in article 9.07 of the CBA, that circumstance is largely immaterial to the matter before us at present, because under § 28–9–17 the union's motion to confirm, standing alone, was sufficient to trigger the Superior Court's review of the award.

This is so because § 28–9–17 provides that upon a motion to confirm, the court "*must* grant the order *unless* the award is vacated, modified, or corrected as prescribed in §§ 28–9–18 and 28–9–19, or unless the award is unenforceable under the provisions of § 28–9–13." (Emphases added.) The plain language of § 28–9–18(a) states that the reviewing court "*must* make an order vacating the award, upon application of any party to the controversy which was arbitrated" (emphasis added) if it finds any of the following three circumstances:

"(1) When the award was procured by fraud.

"(2) Where the arbitrator or arbitrators exceeded their powers, or so imperfectly executed them, that a mutual, final and definite award upon the subject matter submitted was not made.

"(3) If there was no valid submission or contract, and the objection has been raised under the conditions set forth in § 28–9–13."

It follows, then, that once the award was before the court, the hearing justice was obliged to vacate it if he determined, as he did here, that the arbitrator had exceeded his power. *State Department of Corrections*, 867 A.2d at 828–29.

Other courts facing similar issues have concluded that a motion to vacate is not a mandatory precursor to the vacation of an arbitration award when that award suffers from a defect identified within the statutes that govern arbitration in the jurisdiction. For example, Iowa's arbitration statute quite plainly requires confirmation of an arbitration award "unless within the time limits imposed * * * grounds are urged for vacating, modifying, or correcting the award." Iowa Code Ann. § 679A.11 (West 1998). Nevertheless, the Supreme Court of Iowa upheld a reviewing court's right to vacate a decision in the face of an unopposed motion to confirm: "Although section 679A.11 contemplates the court will vacate or correct an arbitration award in response to grounds urged by a party, it does not prohibit the court from raising these grounds on its own." *$99 Down Payment, Inc. v. Garard*, 592 N.W.2d 691, 695 (Iowa 1999).

The Fourth Court of Appeals of Texas addressed the very issue we now face, albeit in a different context:

"As a preliminary matter, we must address whether we may even entertain this appeal because both parties expressly waived their rights of appeal in their stock purchase agreement. The arbitration provisions in the parties' agreement included a provision for arbi-

---

**3.** We save for another day, however, the question of whether parties to an arbitration may even waive the right to "appeal" an arbitrator's award in the context of a municipal employees' arbitration implicating public health and safety. Because we are satisfied that the hearing justice in this case had the authority to vacate the award under G.L.1956 § 28–9–17, we need not determine the validity *vel non* of the waiver clause.

tration finality: 'An award or determination of the arbitration tribunal shall be final and conclusive upon the parties, judgment thereon may be entered by any court of competent jurisdiction and no appeal thereof shall be made by the parties.' * * * [A] waiver of appeal in the arbitration agreement does not preclude judicial review of matters concerning Texas Civil Practice and Remedies Code sections 171.088 and 171.091." *Barsness v. Scott,* 126 S.W.3d 232, 237–38 (Tex.App.2003).

Under Tex. Civ. Prac. & Rem.Code Ann. § 171.088(a)(3)(A) (Vernon 2005), on application of a party, the court shall vacate an award if the arbitrators "exceeded their powers."

■■■ Although we hold that a motion to vacate was not required to prompt the hearing justice's review and eventual vacation of the arbitrator's award, it is of course true that the city did file a motion to vacate that award. But we need not attempt to "unring" that bell. The extent to which a hearing justice is obligated to scrutinize an award before the court on an unopposed motion to confirm may remain an open question, but because we discern a difference here between the city's motion to vacate and its objection to the motion to confirm, we need not dwell on that point. Referring back to the previously cited Black's Law Dictionary definition of "appeal," we note that there are two critical components of an appeal: first, that it is "undertaken" by the appellant by virtue of the "submission" of a decision to a higher court; second, that the appellant seeks the reversal of that decision. Black's Law Dictionary 105 (8th ed. 2004). The definition of "appeal" as a verb—"[t]o seek review (from a lower court's decision) by a higher court"—highlights that the overt act of *seeking* the reversal of a decision is just as much a part of an appeal as the hoped-for reversal itself. *Id.* at 106. An aggrieved party initiates an appeal; a party opposing a motion initiated by an adverse party raises an objection. The city's objection constituted an "application" to the reviewing court, and provided sufficient grounds to justify a continuation, under § 28–9–18, of the inquiry that the motion to confirm set in motion under § 28–9–17. *Cf. Fleet Construction Co. v. Town of North Smithfield,* 713 A.2d 1241, 1243 (R.I.1998) (after the statute of limitations for filing a motion to vacate has run, a party may still oppose the confirmation of an arbitration award by filing an objection to the motion to confirm).

■■■ In the instant case, the waiver clause undoubtedly presents a bit of a conundrum. The parties to the CBA took their chances when they signed off on such a waiver, and it may well be that our interpretation of its import yields a result different from the one originally envisioned by its drafters. But whatever the drafters intended, what they produced was imperfect. Once the union filed a motion to confirm, it bore the risk that the city would object to its motion, and that the hearing justice would vacate the award upon review. Having invoked the court's authority to confirm the award, the union should not be heard to complain that the hearing justice diligently undertook his statutory obligation to vacate the award if he found any of the specific circumstances enumerated in § 28–9–18. We will not countenance an interpretation of the court's statutory responsibilities in arbitration cases that reduces the role of the hearing justice to a mere rubber stamp. *See* 6 C.J.S. *Arbitration* § 181 (2004) (citing *MBNA America Bank, N.A. v. Coe,* 2 Misc.3d 355, 770 N.Y.S.2d 588, 590 (N.Y.City Ct.2003)); *see also In re Robinson/Keir Partnership,* 154 Vt. 50, 573 A.2d 1188, 1190 (1990).

■ The fact that the hearing justice granted the city's motion to vacate in part is immaterial to our analysis. We simply do not read the waiver of appeal clause so broadly as to prohibit the city from objecting to a motion to confirm. In light of § 28–9–17's mandate that the court must confirm "unless the award is vacated * * * as prescribed in § [ ]28–9–18 * * *," the same result would have been reached if the only motion before the hearing justice had been the motion to confirm.

### B. The Arbitrator's Award

■ In the "Remedies" section of his award, the arbitrator opined: "There is a spectrum in which relief must be fashioned for the transgressions that limited, if not eliminated, the grievant's due process protections prior to his actual discharge, or prior to when his actual discharge should have occurred." That spectrum, according to the union, was established in 1990, when the General Assembly amended § 28–9–1 to add the following language: "Unless the parties agree otherwise in writing, in the arbitration of matters relating to the disciplining of employees, including, but not limited to, termination, suspension or reprimand, the arbitrator shall have the authority to modify the penalty imposed by the employer and/or fashion an appropriate remedy." P.L. 1990, ch. 378, § 1. We observe, however, that even if an arbitrator may, when appropriate, overturn an employer's termination of an employee and craft an alternative sanction, any retooled remedy must be rational to survive our review. *See State Department of Corrections v. Rhode Island Brotherhood of Correctional Officers,* 725 A.2d 296, 298 (R.I. 1999); *see also State Department of Children, Youth and Families v. Rhode Island*

*Council 94, AFSCME, AFL–CIO,* 713 A.2d 1250, 1259 (R.I.1998). Indeed, under § 28–9–18(a)(2), this Court has held that when an arbitrator issues an irrational award, that arbitrator has exceeded his authority and the award must be vacated. *Woonsocket Teachers' Guild, Local 951, AFT,* 770 A.2d at 837.

In this instance, the arbitrator was asked to resolve two issues: (1) whether the city had provided Mr. Smith with an adequate pre-termination hearing; and (2) whether the city had just cause to suspend and terminate Mr. Smith. If the arbitrator answered the second question in the negative, he was asked to extend the scope of his deliberations and fashion an appropriate remedy. And although the arbitrator quite reasonably divided his analysis of the issues into two distinct sections and answered each definitively, the award he ultimately ladled out came from a brackish mixture of both. The arbitrator found that the due process to which Mr. Smith was entitled before his termination was lacking, and he cited a number of treatises to support the notion that without due process, there can be no just cause.[4] But then the arbitrator went on to find that "there was cause for his dismissal, albeit it should have been with the due process entitlements described in 'Decision—Due Process,' above."

In the "Remedies" section of his decision, the arbitrator attempted to reconcile the two seemingly contradictory findings on due process and just cause; the result is well-intentioned but oversteps the boundaries this Court's precedent has established with respect to arbitrators' authority under chapter 9 of title 28. *See*

---

4. The arbitrator's due process analysis includes citations to the following treatises: Elkouri & Elkouri, *How Arbitration Works* (Alan Miles Ruben ed., 6th ed. 2003); *The Common* *Law of the Workplace* (T.J. St. Antoine ed., 2d ed. 2005); *Labor and Employment Arbitration* (Tim Bornstein et al. eds., Lexis Nexis 2d ed. 2007) (1997).

*Pawtucket Fraternal Order of Police Lodge # 4 v. City of Pawtucket,* 869 A.2d 67, 69–70 (R.I.2005); *State v. Rhode Island Alliance of Social Service Employees, Local 580,* 861 A.2d 455, 457 (R.I.2004). In the end, the arbitrator upheld the city's discharge of Mr. Smith, but then ordered that he be "reinstated" as a police dispatcher, a position he had held some ten years earlier. This effectively amounts to a transfer and a demotion, but it is in fact a discharge and reinstatement. The final paragraph of the "Remedies" section reads:

"There was just cause for the grievant's discharge as ACS at EPAS, as noted in detail above. That discharge will be part of the grievant's personnel file kept with the City; however, it shall be, essentially, 'sealed' with respect to this decision. His intervening years of service with EPAS until his reinstatement to the police dispatcher position, as directed herein, shall be uncharacterized and shall not be used in assessing his fitness, or lack thereof, for future promotions within his job functions as a dispatcher or other future employment with the City."

The arbitrator found that the city failed to provide adequate due process to Mr. Smith before his termination, and seemingly concluded that this failure nullified the just cause that the city otherwise would have had for the termination. Yet the decision ultimately calls for Mr. Smith to be discharged for cause—an outcome that, by the terms of the issues submitted for arbitration, should have brought the matter to a close.

■ Again, the second question put to the arbitrator was "Did the City have just cause to suspend and terminate John Smith? If not, what shall the remedy be?" It is patently irrational to answer the first part of this question in the affirmative and then proceed to address the second part. One could certainly argue the arbitrator considered the due process question and the just cause question independently, so that his determination of just cause was merely a preliminary finding, the calculus of which could not be complete until it was plugged into a more comprehensive equation that included the due process variable. That may well be true, but the fact remains that after considering all possible "x" factors, the arbitrator's solution included the discharge of Mr. Smith for just cause, and that is where it should have ended. Once the arbitrator found just cause, he exceeded his authority by requiring the city to reinstate Mr. Smith in another position. *See State Department of Corrections,* 867 A.2d at 830–31.

## IV

### Conclusion

In summary, we conclude that the waiver of appeals clause in the collective bargaining agreement did not prevent the hearing justice in the exercise of his statutory duties, from reaching the merits of the arbitration award. Because we concur with the hearing justice that the arbitrator exceeded his authority by reinstating Mr. Smith to the position of police dispatcher, we affirm the judgments. We remand the papers in the case to the Superior Court.