Paula J. DiPAOLA

v.

Anthony DiPAOLA.

No. 2009–61–Appeal.

Supreme Court of Rhode Island.

March 11, 2011.

Robert S. Parker, Esq., Providence, for Plaintiff.

Colleen M. Crudele, Esq., North Providence, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Chief Justice SUTTELL, for the Court.

The plaintiff, Paula J. DiPaola, appeals from two Family Court post-final judgment orders in favor of her former husband, Anthony DiPaola (defendant). The first order, dated October 22, 2008, reversed a decision of the general magistrate holding that the parties' marital settlement agreement was ambiguous. The second order denied the plaintiff's request to amend the first order, for the purpose of remanding to the general magistrate for a decision on whether the marital settlement agreement should be vacated. This case came before the Supreme Court for oral argument pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not summarily be decided. After reviewing the record and considering the parties' written and oral submissions, we are satisfied that this appeal may be decided without further briefing or argument. For the reasons set forth in this opinion, we vacate the Family Court's order of October 22, 2008.

## I

### Facts and Procedural History

After their divorce proceedings began, Mr. and Mrs. DiPaola executed a marital settlement agreement (agreement) on August 11, 2004. The agreement was incorporated by reference but not merged into a final judgment of divorce that was entered on November 18, 2004. The agreement, approved by the Family Court, contains certain provisions that provide for the equitable distribution of the parties' marital estate.

For a period of four to five years prior to and during the divorce action, defendant was employed as vice president and corporate controller of Ionics, Inc. Part of defendant's employment compensation with Ionics included certain stock options. With respect to the division of those stock options as part of the divorce action, paragraph 7.D of the agreement, entitled "Stocks," provides:

"The Husband has vested stock options as follow:

"*IONICS, INCORPORATED STOCK OPTIONS*

| | |
|---|---|
| 5/22/00 Grant, 6,000 shares @ $27.06 p/s, 80% vested as of 5/22/04 | unknown |
| 11/1/00 Grant, 2,000 shares @ $21.06 p/s, 60% vested as of 11/1/03 | $5,448 |
| 8/14/02 Grant, 8,000 shares @ $21.09 p/s, 20% vested as of 8/14/04 | $1,605 |
| 2003 Grant | unknown |
| 4/30/04 Grant, 25,000 shares @ $23.07 p/s, unknown % vested | unknown |

"At such time as the Husband shall exercise *said options*, after payment of all federal and state income taxes, brokerage fees and other costs associated with exercising the options, the parties shall each receive a sum which shall be equal to one-half (1/2) of net value of the profit of said exercised shares. Provided, however, that in the event the Husband wishes to retain his options and the Wife wishes to exercise hers, the Husband, at the Wife's request, will either exercise the Wife's one-half share of the options for each vesting period, or he shall pay to her a sum which she would have received if the options had been exercised. In the event he exercises the Wife's share of the options, the Wife shall receive the net amount received

from the cashing in of her share of the options, net of federal and state withholdings, brokerage fees and other costs associated with exercising the options; or, Husband shall at his option, provide Wife 1/2 of said options or shall purchase the identical amount of said options AND deliver same to Wife [within] 30 days. ALL costs [b]y Husband." (Emphasis added.)

On November 24, 2004, six days after final judgment of divorce was entered, Ionics entered into a merger agreement with General Electric. That merger triggered the immediate vesting of the portion of defendant's stock options that had not yet vested as of the date the marital settlement agreement was executed. Soon thereafter, in early 2005, defendant exercised all of his Ionics stock options—including those that vested both before and after the execution of the marital settlement agreement—realizing a net sum of $854,000.[1]

The controversy in this case arose after plaintiff received a check from defendant for $61,780.73 in the spring of 2005, accompanied by a letter stating that the payment was for her one-half share of "the net proceeds of the *vested* stock options at the date of [the marital settlement agreement]." (Emphasis added.) The defendant calculated this payment based upon his understanding of paragraph 7.D of the agreement, which he interpreted to include only those stock options that had vested as of August 11, 2004, the date the agreement was executed. The letter explained that Ionics had been sold and that defendant had been "paid out" for his stock options as a result; the letter did not, however, refer to the remaining stock options that had vested on November 24, 2004.

In response to defendant's letter, plaintiff contacted her attorney and. subsequently learned that defendant had received a total of $854,000 from his stock holdings. In August 2005, plaintiff filed a postjudgment motion to enforce the terms of the agreement. The plaintiff contended that paragraph 7.D of the agreement unambiguously assigned to her one-half of all stock options held by defendant, including those that vested after the marital settlement agreement was executed. In her posttrial memorandum, plaintiff argued in the alternative that the court should vacate the agreement based upon defendant's alleged fraudulent nondisclosure of "the merger and its vesting effect on [the] nonvested options." Finally, plaintiff argued that the court should vacate the agreement because it no longer provided "substantial justice" between the parties.

The defendant objected to plaintiff's motion. First, defendant maintained that the agreement unambiguously entitled plaintiff to one-half of only those stock options that had vested at the time the parties signed the agreement on August 11, 2004. The defendant further argued that the contractual cutoff date of plaintiff's interest was August 11, 2004, and that plaintiff contractually waived any interest in all other assets acquired by defendant subsequent to said date. Lastly, defendant filed a counterclaim for reckless misrepresentation, arguing that he did not know about the merger prior to August 11, 2004 and that plaintiff's claim of fraud was both frivolous and uncorroborated.

A hearing was conducted before the general magistrate in Family Court on December 4, 2007. The issue before the general magistrate was whether the agreement entitled plaintiff to one-half of all stock options held by defendant, rather

---

**1.** Although defendant testified that he received $854,050 as a result of the merger, we use the value of $854,000 as referred to in the Family Court decisions.

than one-half of only those stock options that were vested on August 11, 2004, the date the agreement was executed. At the hearing, defendant testified that his primary role with Ionics was to file various documents with the Securities and Exchange Commission and "maintain accounting and finance organization." He also served as the primary contact between Ionics and its auditors, and as a liaison with an outside law firm. The defendant worked in close proximity to other executive officers, including corporate counsel Stephen Korn and chief financial officer Daniel Kuzmak. The defendant testified that he first became aware of discussions about the merger "[o]n or about October 22[, 2004]," the day that he signed a nondisclosure agreement concerning the merger negotiations. Around this time, defendant became aware that the potential merger would entitle him to over $800,000 for his stock options. The defendant testified that he did not convey this information to plaintiff because he was prohibited from doing so by the nondisclosure agreement.

The plaintiff testified that she learned about the merger around late November 2004, after it was announced publicly. Based on her understanding of the agreement, plaintiff believed that she was entitled to one-half "of whatever the options were at the time they were exercised," including those options that vested as a result of the merger.

Despite her allegations of fraud, plaintiff admitted on cross-examination that she had no concrete evidence that defendant knew about the merger at the time the parties executed the agreement in August 2004. In support of her allegations, plaintiff pointed to the deposition testimony of several Ionics executives showing that they learned about the merger prior to October 22, 2004, the date that defendant claimed to have learned of the proposed merger. This deposition testimony, however, also indicated that defendant was not involved in these early discussions about the merger. The plaintiff testified that considering defendant's "position in the company[,] I find it hard not to be true" that defendant was aware of the merger before the agreement was executed.

The president of Ionics, Douglas Brown, had first become involved in the discussions about a potential merger on July 7, 2004. Several other Ionics executives, including Mr. Korn and Mr. Kuzmak, also were involved in early discussions before October 22, 2004. Mr. Brown testified at his deposition that defendant was not one of the "five or six" people who had knowledge of the potential merger prior to signing a nondisclosure agreement. The deposition testimony of Mr. Korn and Mr. Kuzmak corroborated Mr. Brown's testimony, indicating that defendant had no knowledge of the merger discussions until the date defendant signed his nondisclosure agreement in October 2004.

The general magistrate issued a bench decision on April 15, 2008, and a corresponding order was entered on May 5, 2008. The general magistrate found paragraph 7.D to be ambiguous because it was "reasonably susceptible of different constructions." The general magistrate determined that it was unclear whether the term "said options" in the agreement referred to both vested and non-vested stock options. He further indicated that the court must adopt a construction that was "most equitable" without giving one party "an unconscionable advantage" over the other.

The general magistrate next addressed plaintiff's allegations of fraud. He stated that to establish a case of common law fraud, plaintiff must prove that defendant "intentionally failed to disclose the merger

and its effect on the non-vested stock in order to deprive [plaintiff] of her equitable interest in their marital estate." The general magistrate found that the record "clearly reflects impropriety on [defendant's] part" for failing to provide information during discovery about his stock options that vested after the marital settlement agreement was executed, and for sending plaintiff $61,780.73 without explaining the total amount he received after the merger. However, the general magistrate did not find that defendant's impropriety amounted to fraud.

The general magistrate concluded that "[t]he [a]greement was ambiguous * * * and in order to not allow unconscionable advantage to one over the other, the [agreement] must be set aside or vacated, or in the alternative to give the [p]laintiff her one-half share of the $854,000.00." Pursuant to G.L.1956 § 8–10–3.1(d),[2] defendant timely appealed from the general magistrate's decision to the chief judge of the Family Court.

On October 9, 2008, the then chief judge issued a written decision reversing the general magistrate's ruling. A corresponding order was entered on October 22, 2008. The chief judge concluded that the agreement was unambiguous, reasoning that the plain language of paragraph 7.D "[a]t all times * * * identifies *vested* stocks." The decision failed to address the general magistrate's findings concerning the impropriety of defendant's actions or the alternate remedy of setting aside or vacating the agreement as mentioned in the general magistrate's order. Instead, the chief judge opined that, "[a]lthough[ ] the result may be one that is perceived to be as unfair, that is not the role of [the Family Court's] review at this time." He stated that the court's review was limited to "the [g]eneral [m]agistrate's finding that the [agreement] is ambiguous."

On October 17, 2008, plaintiff filed a motion to amend the chief judge's decision, pursuant to Rule 59(a) of the Family Court Rules of Procedure for Domestic Relations, whereby she sought to have the matter remanded to the general magistrate to address the issue of whether the agreement should be vacated under *Gorman v. Gorman,* 883 A.2d 732 (R.I.2005), on the grounds that "it no longer is equitable and fair" to plaintiff. The plaintiff argued that this issue had yet to be addressed, despite plaintiff's prior request set forth in her posttrial memorandum to the general magistrate. The chief judge denied plaintiff's motion to amend.[3]

On November 6, 2008, plaintiff timely appealed to this Court from the October 22, 2008 order reversing the general magistrate's decision, and from the November 5, 2008 order denying plaintiff's motion to amend.[4]

---

**2.** General Laws 1956 § 8–10–3.1(d) provides:

"A party aggrieved by an order entered by a magistrate shall be entitled to a review of the order by a justice of the family court. Unless otherwise provided in the rules of procedure of the family court, such review shall be on the record and appellate in nature. The family court shall by rules of procedure establish procedures for review of orders entered by a magistrate, and for enforcement of contempt adjudications of a magistrate."

**3.** The Family Court entered two identical orders denying plaintiff's motion to amend. An associate justice entered the first order on November 5, 2008, and the chief judge entered the second order on November 13, 2008.

**4.** The plaintiff filed a single notice of appeal listing both the October 22, 2008 order and the November 5, 2008 order. This Court's prebriefing notice indicates that this matter was docketed for review of the October 22, 2008 order. Based on Article I, Rule 30 of the Supreme Court Rules of Appellate Proce-

## II

## Standard of Review

A property settlement agreement "that is not merged into a divorce judgment retains the characteristics of a contract." *Riffenburg v. Riffenburg*, 585 A.2d 627, 630 (R.I.1991). "The existence of ambiguity in a contract is a question of law." *Paul v. Paul*, 986 A.2d 989, 993 (R.I.2010). We review questions of law *de novo. Lajayi v. Fafiyebi*, 860 A.2d 680, 686 (R.I.2004). "A reviewing court has no need to construe contractual provisions unless those terms are ambiguous." *A.F. Lusi Construction, Inc. v. Peerless Insurance Co.*, 847 A.2d 254, 258 (R.I.2004). "When contract language is clear and unambiguous, words contained therein will be given their usual and ordinary meaning and the parties will be bound by such meaning." *Singer v. Singer*, 692 A.2d 691, 692 (R.I.1997) (mem.). "[T]his Court will deem agreements to be ambiguous when they are reasonably and clearly susceptible to more than one rational interpretation." *A.F. Lusi Construction, Inc.*, 847 A.2d at 258. "In making this determination, the court should view the agreements in their entirety and give the contractual language its 'plain, ordinary and usual meaning.'" *Id.* (quoting *W.P. Associates v. Forcier, Inc.*, 637 A.2d 353, 356 (R.I.1994)).

## III

## Discussion

The plaintiff raises several arguments on appeal. The first issue is whether the chief judge erred as a matter of law when he found that paragraph 7.D of the agreement unambiguously entitled plaintiff to one-half of only those stock options that had vested as of the date the agreement was executed. The plaintiff argues that the agreement unambiguously entitles her to one-half of all the stock options, both vested and non-vested as of the date the agreement was executed. Alternatively, plaintiff argues that, if the Court deems the agreement to be ambiguous, the agreement should be construed in a manner that is most equitable to the parties.

In addition, plaintiff argues that the chief judge erroneously declined to address the portion of the general magistrate's decision pertaining to whether the agreement should be vacated on the basis of fraud. Finally, plaintiff contends that the chief judge erred by refusing to remand the case to the general magistrate for further clarification of whether the agreement should be set aside or vacated based upon equitable considerations.

After reviewing the marital settlement agreement, the chief judge found that the agreement unambiguously assigned to plaintiff one-half of only those stock options that were vested on August 11, 2004. In his written decision, the chief judge reasoned that the plain language of paragraph 7.D of the agreement at all times "identifie[d] *vested* stocks." We respectfully disagree with the chief judge's dispositive finding that the agreement was unambiguous.

This Court consistently has stated that a contract is ambiguous if it is "reasonably and clearly susceptible to more than one rational interpretation." *A.F. Lusi Construction, Inc.*, 847 A.2d at 258. It is apparent that the term "said options" in

dure, plaintiff's appeal from the October 22, 2008 order "preserves for review any claim of error in an order upon a reserved motion * * * to amend judgment." Thus, plaintiff's appeal from the October 22, 2008 order, as docketed by this Court, preserves for review plaintiff's claimed error in the November 5, 2008 order, and plaintiff was not required to file a separate notice of appeal.

paragraph 7.D of the agreement is capable of two very different interpretations.

■ The defendant maintains that the agreement is unambiguous and clearly divides only those stock options that had vested as of August 11, 2004. As noted by the chief judge, the first sentence of paragraph 7.D refers to *"vested* stock options," suggesting that the agreement was meant to distribute only vested options and that the term "said options" therefore refers to only those options that had vested before the agreement was executed. (Emphasis added.) Moreover, the schedule of stock options that immediately follows, expressly references the percentage of each grant—for three of the five stock option grants—that had vested at that time.

To the contrary, plaintiff argues that the clear language of the agreement entitles her to one-half of all of defendant's stock options, including those that had not yet vested as of August 11, 2004. As found by the general magistrate, the non-vested portion of each grant listed in paragraph 7.D also is included in the schedule of stock options. Further, two of the five grants do not distinguish between the portion that is vested and the portion that is non-vested. Immediately following the schedule of vested and non-vested options listed in paragraph 7.D, the agreement states: "At such time as the Husband shall exercise *said options* * * * the parties shall each receive a sum which shall be equal to one-half (1/2) of net value of the profit of said exercised shares." (Emphasis added.) The direct antecedent to "said options" is the list of all stock options, both vested and non-vested, suggesting that the term "said options" was intended to include non-vested as well as vested options.

After carefully reviewing the agreement and giving the terms their ordinary and usual meaning, we hold that paragraph 7.D of the agreement is reasonably susceptible to two different meanings, and therefore is ambiguous. It is unclear whether the term "said options" refers to both vested and non-vested stock options. One reasonably may read paragraph 7.D both as dividing only those stock options that had vested as of the date of the agreement, or as dividing all of defendant's stock options, including those that did not become vested until the Ionics merger.

■ Having deemed the agreement ambiguous, this Court next must review the record to discern the intended meaning of paragraph 7.D. "In construing an ambiguous contract provision, it is necessary to examine both the circumstances surrounding the development of the ambiguous terms and the intentions of the parties." *Flynn v. Flynn,* 615 A.2d 119, 121 (R.I. 1992). A primary purpose of the agreement in this case is to determine the property rights of the parties. Paragraph 7 of the agreement states that the parties agreed to "an equitable division of all property belonging to them or in which they may have an interest or right," including "their respective interest in any and all real estate and personal property of every kind and nature no matter where same may be situated." As to the equitable division of defendant's stock options, plaintiff argues that the intent of the agreement is to divide all of the stock options equally. The plaintiff testified before the general magistrate: "When I signed this contract it was not the vested option[s]. It was half of whatever the options were at the time they were exercised."

The defendant, on the other hand, contends that the purpose of the agreement is to divide only those stock options that had vested as of the date the agreement was executed. The defendant argues that plaintiff expressly waived her interest in the non-vested stock options, citing a provision contained in paragraph 16 of the

agreement, which states the following: "Each party waives any interest he or she may have in and to any assets acquired by the other party subsequent hereto and prior to the entry of any Final Judgment of Divorce." It is defendant's contention that this provision effectively changes the terminal date for equitable distribution of marital assets from the date of final judgment of divorce to the date the agreement was executed, August 11, 2004. *See Ruffel v. Ruffel,* 900 A.2d 1178, 1185 (R.I.2006) (providing that the final divorce decree date is the terminal date for equitable division of marital assets "absent an express agreement to the contrary") (quoting *Janson v. Janson,* 773 A.2d 901, 904 (R.I. 2001)).

The plaintiff argues to the contrary that, if plaintiff's interest was intended to be limited only to vested stock options, the agreement would have so stated and would have incorporated her express waiver of non-vested options. Moreover, although the stock options at issue did not vest until after the parties executed the agreement, those options were nonetheless acquired by defendant during the marriage. As a general rule, non-vested stock options acquired during marriage constitute divisible marital or community property. *See* 24 Am.Jur.2d *Divorce and Separation* § 488 (2010); Charles P. Kindregan, Jr. & Patricia A. Kindregan, *Unexercised Stock Options and Marital Dissolution,* 34 Suffolk U.L.Rev. 227, 231–32 (2001).

The defendant further argues that a settlement letter from plaintiff, dated June 14, 2004, corroborates the parties' intent that plaintiff would share in only those options that had vested as of August 11, 2004. The letter omits any express reference to non-vested stock options, and states that "[t]he vested stock options will

be divided 50/50." We find this argument unpersuasive, however.

▮ We have long held that when a contract provision is capable of two separate constructions, a court should "adopt that construction which is most equitable and which will not give to one party an unconscionable advantage over the other." *Antone v. Vickers,* 610 A.2d 120, 123 (R.I. 1992) (quoting *Massasoit Housing Corp. v. Town of North Kingstown,* 75 R.I. 211, 217, 65 A.2d 38, 40 (1949)). This was the approach taken by the general magistrate when he held that "in order to not allow unconscionable advantage to one over the other," the agreement "must be set aside or vacated, or in the alternative * * * give the [p]laintiff her one-half share of the $854,000.00." We agree.

Consistent with the general magistrate's holding, it is our opinion that plaintiff's interpretation of paragraph 7.D of the agreement—entitling her to one-half of all defendant's stock options—provides the most equitable construction of the ambiguous provision. To interpret the agreement as not dividing those stock options that had not yet vested as of the date of the agreement would cause plaintiff to receive only $61,780.73 out of the net proceeds of defendant's Ionics stock options totaling $854,000.

We conclude that the more equitable construction of paragraph 7.D of the agreement dictates that the plaintiff be entitled to one-half of all stock options earned by the defendant during the marriage, including those that vested after the agreement was executed.[5] This holding is supported by the agreement's stated purpose, which is to provide a fair and equitable distribution of marital assets as contemplated by the parties.

---

**5.** Because we have determined that plaintiff is entitled to one-half of the stock options, both vested and non-vested, we need not address plaintiff's remaining arguments on appeal.

## IV

### Conclusion

For the reasons stated in this opinion, we vacate the October 22, 2008 order of the chief judge of the Family Court. The record shall be remanded to the Family Court with instructions to enter an order awarding the plaintiff a one-half share of the net amount received by the defendant from the sale of the stock options in Ionics, Inc.