**Supreme Court**

No. 2013-106-Appeal.
(PC 10-1980)

Rhode Island Joint Reinsurance Association    :

v.                             :

Genoveva Santana-Sosa, Alias et al.       :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Rhode Island Joint Reinsurance Association    :

v.                                  :

Genoveva Santana-Sosa, Alias et al.        :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Chief Justice Suttell, for the Court.**  This appeal results from an interpleader action brought by the Rhode Island Joint Reinsurance Association (RIJRA) against multiple defendants for the purpose of determining the proper disposition of insurance proceeds.[1]  Genoveva Santana-Sosa, one of the defendants, appeals from a judgment of the Superior Court in favor of Bank of America, N.A. (BANA).[2]  The Superior Court granted BANA's motion for summary judgment with regard to the interpleader claim as well as all other claims asserted by Santana-Sosa in this action.[3]

This case came before the Supreme Court pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After considering the parties' written and oral submissions and reviewing the record, we conclude that cause has not been shown and that this case may be decided without further

---

[1] The interpleader defendants were: Genoveva Santana-Sosa, Alias, McCauley & L'Europa, LLC (McCauley & L'Europa), and Mortgage Electronic Registration Systems, Inc. (MERS).

[2] Santana-Sosa is the only defendant in this action to have filed a notice of appeal.  Accordingly, this Court will not consider the prebrief filed by McCauley & L'Europa.

[3] Santana-Sosa filed a third-party complaint against "Countrywide Bank"; BANA claims to be a successor servicer of BAC Home Loans Servicing, LP (BAC), which is a successor-in-interest to Countrywide Home Loans Servicing LP.  Santana-Sosa also filed a cross-claim against MERS.

briefing or argument.  For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

# I

## Facts and Procedural History

On November 3, 2006, Santana-Sosa purchased real property located at 100-102 Laura Street in the City of Providence (the property).  On the same day, she executed an adjustable-rate note to Impac Funding Corporation d/b/a Impac Lending Group (Impac) in the principal amount of $264,000.  She also granted a mortgage on the property to Mortgage Electronic Registration Systems, Inc. (MERS), as nominee for Impac and its successors and assigns, as security for repayment of the note.[4]  The terms of the mortgage required that the borrower maintain insurance on the property and that the insurance policy include a clause naming the lender "as mortgagee and/or as an additional loss payee."  At the closing of the loan, Santana-Sosa executed a Hazard Insurance Authorization & Requirements document (hazard authorization), which listed Impac and its successors and assigns as the loss payee.  Santana-Sosa also obtained an

---

[4] The mortgage provided in part:

> "Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with Mortgage Covenants upon the Statutory Condition and with the Statutory Power of Sale, [the property]. * * * Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and cancelling this Security Instrument."

insurance policy on the property from RIJRA, in which "Countrywide Home Loan Inc."[5] was listed as the mortgagee.[6]

On or about January 4, 2008, a fire occurred at the property. Santana-Sosa subsequently entered into an agreement with McCauley & L'Europa, LLC (McCauley & L'Europa), a public insurance adjusting company, in which Santana-Sosa agreed to provide McCauley & L'Europa with a percentage of any insurance disbursement. Santana-Sosa then defaulted on payments due under the note and mortgage, and MERS initiated foreclosure proceedings. The property was sold at a foreclosure sale on June 1, 2009. MERS was the high bidder at the sale with a bid of $36,000, and MERS then assigned its bid to Deutsche Bank National Trust Company (Deutsche). After the foreclosure sale, the note and mortgage had an unpaid deficiency of $263,064.44.

RIJRA issued a check dated September 8, 2008 for $245,188.28, payable to three parties: McCauley & L'Europa, "Countrywide Bank, FSB," and Santana-Sosa. According to RIJRA, this check has been lost or destroyed, and "[d]efendants have demanded a new check without the name of a mortgagee thereon." RIJRA initiated an interpleader action in Superior Court in order to litigate the respective rights of Santana-Sosa, McCauley & L'Europa, and MERS with regard to the insurance proceeds. On May 12, 2011, the hearing justice granted RIJRA's motion to

---

[5] The record of this case contains references to various "Countrywide" entities: "Countrywide Home Loans Servicing LP," which is BANA's purported predecessor servicer; "Countrywide Bank, FSB," which is listed on the insurance check and is the entity to which Santana-Sosa addressed her third-party complaint; and "Countrywide Home Loan Inc.," which is the entity listed on the insurance documents. The relationship between these entities is unclear.

[6] The record of this case does not contain a copy of the insurance policy. The record does, however, contain an "amended declaration" effective April 13, 2007, executed by RIJRA, which listed "Countrywide Home Loan Inc." as the mortgagee. The record also contains a "request for change to insurance policy" form, executed along with the hazard authorization and initialed by Santana-Sosa, in which Impac requested to change the mortgagee clause to read Impac, care of "Countrywide Home Loans," and its successors and/or assigns. According to BANA, a Countrywide entity—which was succeeded by BAC and then BANA—became the servicer for Deutsche Bank National Trust Company (Deutsche) at some point during the life of the loan.

deposit $245,188.28 into the Registry of the Superior Court, and RIJRA was discharged from any further liability arising from the insurance policy it had issued to Santana-Sosa.

Santana-Sosa asserted a cross-claim against MERS and a third-party complaint against "Countrywide Bank, FSB," both for declaratory relief. Santana-Sosa asked the court to declare that she was entitled to the entire proceeds of the insurance check, along with McCauley & L'Europa for its contractual fees. Santana-Sosa further requested the following declarations: (1) that MERS and Countrywide Bank are not parties to the insurance contract between RIJRA and herself; (2) that MERS and Countrywide Bank have no beneficial interest in the insurance proceeds; (3) that Countrywide Bank "is a stranger to the title of the subject property"; (4) that MERS, "by foreclosing on the property and selling it to a third party, * * * waived its rights to any proceeds under the terms of the insurance contract"; and (5) that MERS and Countrywide Bank lack standing to make claims to the insurance proceeds.

BAC Home Loans Servicing, LP (BAC), the purported successor to Countrywide Home Loans Servicing, LP and the predecessor to BANA, answered Santana-Sosa's claims as servicer for MERS and Deutsche. BAC also filed a counterclaim against Santana-Sosa, in which it alleged that it was the servicer for Deutsche, which owned the note executed by Santana-Sosa to Impac. Additionally, BAC filed an answer and counterclaim to the interpleader complaint, in which it alleged that it was entitled to the entire balance of the insurance proceeds.

BANA moved for summary judgment on May 25, 2012, on the interpleader claim and against Santana-Sosa on her cross-claim. BANA argued that, by signing the mortgage and the hazard authorization form, Santana-Sosa had agreed that any insurance proceeds would be distributed to the lender and its successors and assigns—in this case, Deutsche. Thus, BANA argued that the insurance proceeds should be distributed to BANA on behalf of Deutsche. In

support of its motion, BANA submitted the affidavit of Assistant Vice President Ruth Joseph. This affidavit provided some factual history regarding the note and mortgage.

Santana-Sosa objected to BANA's motion for summary judgment[7] and submitted her own affidavit, in which she admitted that she had signed the mortgage and the hazard authorization. Santana-Sosa alleged, inter alia, in her affidavit that the closing agent did not sign her name on the final page of the mortgage, that the closing agent did not sign the hazard authorization in her presence, that she, Santana-Sosa, did not receive a notice of default from MERS, and that she "d[id] not owe any money to Bank of America, MERS, Deutsche Bank, Impac or any other party."

The hearing justice conducted a hearing and issued a bench decision granting BANA's motion for summary judgment on October 16, 2012. The hearing justice found that BANA was entitled to the entire amount of the insurance proceeds and that Santana-Sosa was not entitled to any of these disputed funds. An order reflecting this decision was entered on November 13, 2012, and Santana-Sosa filed a timely notice of appeal. Judgment was entered on January 9, 2013.[8]

## II

### Standard of Review

"This Court reviews the grant of summary judgment de novo, employing the same standards and rules used by the hearing justice." NV One, LLC v. Potomac Realty Capital, LLC, 84 A.3d 800, 805 (R.I. 2014) (quoting Carreiro v. Tobin, 66 A.3d 820, 822 (R.I. 2013)). We

---

[7] It appears from the Superior Court docket that Santana-Sosa made two objections to BANA's motion for summary judgment, one on May 14, 2012, and one on June 27, 2012. The file contains only the May 14, 2012 objection.

[8] Because final judgment entered, plaintiff's premature notice of appeal is valid. See Chapdelaine v. State, 32 A.3d 937, 941 n.1 (R.I. 2011).

"will affirm a lower court's decision only if, after reviewing the admissible evidence in the light most favorable to the nonmoving party, we conclude that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law." Id. (quoting Carreiro, 66 A.3d at 822). "[T]he nonmoving party bears the burden of proving by competent evidence the existence of a disputed issue of material fact * * * ." Miller v. Saunders, 80 A.3d 44, 48 (R.I. 2013) (quoting The Law Firm of Thomas A. Tarro, III v. Checrallah, 60 A.3d 598, 601 (R.I. 2013)).

## III

### Discussion

Santana-Sosa's main contention on appeal appears to be that the foreclosure was invalid and, therefore, BANA did not have a right to collect the insurance proceeds. Santana-Sosa contends that the hearing justice erred by determining that the propriety of the foreclosure was not an issue pertinent to this case. According to Santana-Sosa, the hearing justice overlooked multiple issues of material fact regarding the validity of the foreclosure: whether there was an agency relationship between or among MERS and Deutsche, "Countrywide," or BANA; whether the note was properly endorsed; and whether BANA was the servicer for a party with an interest in the note and mortgage.

Santana-Sosa does not, however, attempt to explain how an invalid foreclosure would entitle her to receive the insurance proceeds at issue in this interpleader action. Instead, she merely appears to assert that BANA does not have a legitimate claim to the proceeds and that, therefore, she is entitled to the funds. We do not find this argument to be persuasive. Even if there had been a dispute between the various lenders and servicers as to who among them was

entitled to collect the proceeds, no conceivable resolution of this dispute would result in Santana-Sosa, the borrower, having a legitimate claim to the funds.[9]

Additionally, Santana-Sosa argues that the mortgage was void pursuant to G.L. 1956 § 34-11-1 because it was allegedly missing a signature[10] and that, therefore, BANA is not entitled to collect the insurance proceeds. Page thirteen of the mortgage document, however, shows Santana-Sosa's signature, as well as the signature of a notary public witness. Santana-Sosa does not dispute having signed the mortgage. All that appears to be missing is the signature of the notary on page fourteen of the mortgage, directly above where the notary's name is printed. Even if the mortgage lacked proper notarization, however, this would not render it void. Section 34-11-1 provides in part:

> "Every conveyance of lands * * * by way of mortgage * * * shall be void unless made in writing duly signed, acknowledged as hereinafter provided * * * ; provided, however, that the conveyance, if delivered, as between the parties and their heirs, and as against those taking by gift or devise, or those having notice thereof, shall be valid and binding though not acknowledged or recorded."

Furthermore, while § 34-11-1.1 specifies that "[t]he signatories and notaries public to all * * * mortgages * * * shall have their names typed or printed immediately beneath or adjacent to their signatures," the section further provides that "[f]ailure to comply herewith shall not affect the

---

[9] Counsel for Santana-Sosa asserted at oral argument that he had filed a cross-claim directly challenging the foreclosure. Counsel did file a cross-claim against MERS; this claim, however, was for declaratory relief, in which Santana-Sosa asserted that she was entitled to the insurance proceeds, that MERS was not a party to the insurance contract, that MERS had no beneficial interest in the insurance proceeds, and that MERS lacked standing to make a claim to the insurance proceeds. This cross-claim could not reasonably be construed as a direct challenge to the validity of the foreclosure.

[10] It is unclear whose signature is allegedly missing. Santana-Sosa states that page fourteen of the mortgage "is notarized but never signed by the alleged Mortgagor." Santana-Sosa, however, was the mortgagor, and her signature appears on the "borrower" line on page thirteen. Page fourteen of the mortgage contains only a space for the notary's signature, which is left blank. The notary's printed name appears below the signature line.

validity of any such instrument * * * ." Thus, even if the mortgage was not properly notarized, it would nevertheless constitute a valid agreement between Santana-Sosa and the lender. See Carrozza v. Carrozza, 944 A.2d 161, 165 (R.I. 2008).

Santana-Sosa further argues that the allegations contained in the Joseph Affidavit on behalf of BANA were inadmissible because there was no evidence that Joseph's statements were based upon personal knowledge. In her affidavit, however, Joseph stated that she was an assistant vice president for BANA, that she reviewed the books and records of BANA relating to Santana-Sosa's loan, and that her affidavit was based upon that review. In our opinion, this statement is sufficient to show that her affidavit was "made on personal knowledge" as required by Rule 56(e) of the Superior Court Rules of Civil Procedure. See Mruk v. Mortgage Electronic Registration Systems, Inc., 82 A.3d 527, 534 (R.I. 2013).[11]

BANA, for its part, asserts that the mortgage and the hazard authorization are valid contracts, which required Santana-Sosa to maintain an insurance policy, with Impac and its successors and assigns named as the loss payee. Accordingly, BANA argues that it is entitled to the insurance proceeds as an agent for Deutsche. We agree.

The traditional rules of contract construction apply to the interpretation of a covenant contained in a mortgage. See Bucci v. Lehman Brothers Bank, FSB, 68 A.3d 1069, 1078, 1081 (R.I. 2013). The determination of whether a contract's terms are ambiguous is a question of law, which we review de novo. Furtado v. Goncalves, 63 A.3d 533, 537 (R.I. 2013). This Court "has no need to construe contractual provisions unless those terms are ambiguous." Miller, 80 A.3d at 49 (quoting DiPaola v. DiPaola, 16 A.3d 571, 576 (R.I. 2011)). When "determining ambiguity,

---

[11] We do note that the Joseph affidavit does not clearly establish the chronological travel of the note as between Impac and Deutsche. As mentioned supra, however, these facts have no bearing on the issue presented on appeal, namely, whether Santana-Sosa has any claim to the insurance proceeds.

we construe contractual language in an 'ordinary, common sense manner.'" Id. (quoting City of

East Providence v. United Steelworkers of America, Local 15509, 925 A.2d 246, 251 (R.I.

2007)). "A contractual term is ambiguous if it is 'reasonably and clearly susceptible to more

than one rational interpretation.'" Id. (quoting DiPaola, 16 A.3d at 576).

There are three related contracts at issue in this case: the mortgage, the hazard

authorization, and the insurance policy. Section 5 of the mortgage states in part:

> "5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire * * * .
> "* * *
> "All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. * * *
> "In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. * * * Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. * * *
> "If Borrower abandons the Property, * * * or if Lender acquires the Property under Section 22[12] or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due."

In our opinion, this section of the mortgage clearly required Santana-Sosa to maintain insurance

against loss caused by fire, and it further specified that if the lender or its successors or assigns

---

[12] Section 22 provides for the lender to invoke the statutory power of sale.

acquired the property pursuant to a foreclosure action, Santana-Sosa's rights to any insurance proceeds—not exceeding the amount due under the note—would be assigned to the lender.[13]

Additionally, the hazard authorization provided a list of the "Lender's policies and procedures, and minimum requirements, for Hazard Insurance coverage." One of these requirements stated: "Lender's loss Payable Endorsement 438 BFU to be affixed to policy in favor of: IMPAC FUNDING CORPORATION C/O COUNTRYWIDE HOME LOANS ITS SUCCESSORS AND/OR ASSIGNS." This document, like the mortgage, was signed by Santana-Sosa and the closing officer.[14] Finally, the applicable insurance policy appears to have listed Santana-Sosa as the insured and a "Countrywide" entity as the mortgagee; Santana-Sosa also agreed to a "request for change to insurance policy" that listed the mortgagee as Impac and its successors and assigns, care of "Countrywide Home Loans."

Santana-Sosa has not disputed the validity of the documents relating to the insurance policy, nor has she disputed having agreed to the terms of the mortgage and the hazard authorization, and no valid argument has been presented to suggest that these documents are not binding contracts. We do not perceive any ambiguity in these contracts; the clear result is that Santana-Sosa is not entitled to the insurance proceeds because she agreed to maintain fire

---

[13] Santana-Sosa has not provided evidence that the amount due on the note and mortgage was less than the amount of the insurance proceeds. According to the Joseph affidavit submitted by BANA, the note and mortgage had an unpaid deficiency of $263,064.44 at the time of the foreclosure sale. RIJRA issued a check for the insurance proceeds in the amount of $245,188.28. Santana-Sosa asserted in her own affidavit that she "d[id] not owe any money to Bank of America, MERS, Deutsche Bank, Impac or any other party"; however, "naked conclusory assertions in an affidavit * * * are inadequate to establish the existence of a genuine issue of material fact * * * ." Carrozza v. Carrozza, 944 A.2d 161, 164 (R.I. 2008) (quoting Roitman & Son, Inc. v. Crausman, 121 R.I. 958, 959, 401 A.2d 58, 59 (1979) (mem.)).

[14] Along with the hazard authorization, Santana-Sosa executed a "request and authorization for lender's loss payable endorsement," in which Santana-Sosa authorized the "Mortgagee/Loss Payable clause" of her insurance policy to read: "IMPAC FUNDING CORPORATION c/o COUNTRYWIDE HOME LOANS ITS SUCCESSORS AND/OR ASSIGNS."

insurance on the property with the lender as a loss payee, the lender exercised its statutory power of sale, and the amount of the insurance proceeds was less than the amount unpaid under the note.  Accordingly, we perceive no issues of material fact and we hold that BANA was entitled to judgment as a matter of law.

## IV

## Conclusion

For the reasons stated herein, we affirm the judgment of the Superior Court.  The record shall be returned to the Superior Court.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:** Rhode Island Joint Reinsurance Association v. Genoveva Santana-Sosa, Alias et al.

**CASE NO:** No. 2013-106-Appeal.
(PC 10-1980)

**COURT:** Supreme Court

**DATE OPINION FILED:** June 13, 2014

**JUSTICES:** Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:** Chief Justice Paul A. Suttell

**SOURCE OF APPEAL:** Providence County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Luis M. Matos

**ATTORNEYS ON APPEAL:**

For Defendant: George E. Babcock, Esq.

For Bank of America: David J. Pellegrino, Esq.